[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 57 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 58 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 59 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 60 
OPINION
This is an appeal from judgments of conviction following jury verdicts finding appellant guilty of two counts of burglary (Pen. Code, § 459), two counts of lewd and lascivious acts upon the body of a child (Pen. Code, § 288), assault with intent to commit rape (Pen. Code, § 220), false imprisonment (Pen. Code, § 236) and rape (Pen. Code, § 261, subd. 2). The convictions were based upon two separate incidents, involving different victims. The evidence offered at the consolidated trial of the offenses may be summarized as follows. *Page 61 
The Florence C. Incident
Thirteen-year-old Florence C. (hereinafter Florence) testified that on December 16, 1977, at approximately 5:30 p.m., upon completion of her newspaper delivery route, she entered a garage at 1845 Franklin (between Washington and Clay) in San Francisco, where she intended to meet her brother, Patrick. Florence customarily met her brother in the garage after completion of their respective newspaper routes.
While she waited there, a man, stipulated to be appellant, entered the garage and asked her "Where Powell Street was." Florence gave appellant bus directions. Appellant then left the garage, but immediately returned. He subsequently turned off some lights in the garage, then turned them back on, and closed the garage door from the inside.
Appellant approached Florence and told her to "shut up." Florence screamed, then was told she would be killed if she screamed again. Appellant informed Florence that he had a knife, though she did not see one. Florence screamed again and attempted to leave, but appellant blocked her path and put his arm around her neck. When she struggled, appellant pushed her to the floor. According to Florence, while she was lying on her stomach, with appellant sitting on top of her facing the same direction, appellant put his hand under her panties and onto her buttocks. As this occurred, the garage door was opened; appellant quickly jumped to his feet and started to leave the garage. As she heard the door opening, Florence yelled "rape," then followed after appellant, hitting him with her shoe and swearing at him.
According to Patrick, he approached the garage at about 5:30 p.m, and heard someone scream "rape." He then entered the garage and saw appellant walking out with Florence behind him.
Upon seeing her brother, Florence told him that appellant had threatened her with a knife and tried to rape her. Appellant replied that "He didn't do it"; he complained that Florence had run into him with a newspaper cart, which Florence denied.
Appellant permitted Patrick to search his pockets for a knife; none was found. Meanwhile, Florence left the garage to locate a nearby security guard. Appellant informed Florence and Patrick that his name was "Peter Wong," offered Patrick a photograph of himself, and asked to *Page 62 
leave. Patrick told appellant to wait until the police arrived, and returned the photograph.
Appellant and Patrick then walked to the garage in which appellant's car was parked, at 1890 Clay (between Franklin and Van Ness). They entered appellant's vehicle, and drove around the block to where Florence was waiting with Lee Vernon Cox, a Pinkerton security guard. Cox testified that Florence approached him in an upset state; she requested that he call the police because someone had attempted to rape her.
San Francisco Police Officer Edwin McDonough testified that he and his patrol partner responded to the call placed by Cox, and found Florence upset and crying. McDonough spoke with appellant while his partner interviewed Florence. Appellant recounted to McDonough that Florence had run into him with a newspaper cart, leading to an altercation. Appellant then followed the police to a nearby station, where he was arrested and booked.
On two subsequent occasions, appellant approached Florence and attempted to speak with her. The first time Florence refused, so appellant later asked Patrick if a meeting with Florence could be arranged. At Patrick's suggestion, Florence spoke with appellant. Appellant apologized for the incident and offered Florence a "few hundred dollars" to "forget the whole thing." The offer was refused.
Appellant testified on his own behalf at trial. According to appellant, on the afternoon of December 16, 1977, he completed some errands for his uncle around 4:45-4:50 p.m., whereupon he drove his uncle's car to a Porsche-Audi dealer on Sacramento (between Franklin and Van Ness) to pick up a previously ordered spare part for his own vehicle. He had difficulty finding a parking spot, and ultimately parked in a garage on Clay (midway between Franklin and Van Ness). It was raining, so he ran from his parking space to the parts dealer, which was closed.[1] He ran back to his car, taking a circuitous route — the site where his car was parked being closer to the dealership than the garage where he encountered *Page 63 
Florence. He explained that he did not directly return to his car because he could not remember where it was parked.[2]
As appellant was running down the sidewalk on Clay, he almost bumped into Florence and her newspaper cart. He told Florence to "watch where you are going," whereupon heated words between the two were exchanged, culminating with appellant shoving Florence. Florence pushed her cart through the open garage door, swearing at appellant, and appellant followed her inside the garage. Appellant, tired and angry, wanted Florence to apologize for the incident, so he pushed her toward the back of the garage. However, the heated exchange continued; then appellant lost his temper, "stepped forward and gave her a headlock." Florence struggled, and the two fell to the ground, with Florence landing on her back.
According to appellant's version of the incident, he realized that the altercation was a mistake and was attempting to leave when Patrick arrived.
Appellant denied threatening Florence or stating that he had a knife. He testified that he did not intend to rape her, did not touch her buttocks, did not ask her where Powell Street was, and did not close the garage door or turn the lights on and off.
The Betty N. Incident
On the morning of March 10, 1978, nine-year-old Betty N. (hereinafter Betty) left home with her mother at around 6:30-6:40 a.m. to walk to her school bus stop on Washington Street (near Stockton). However, Betty's mother lost sight of her along the route to the bus stop.
As Betty walked past the Cumberland Church on Stone Street, a man — identified by Betty in court as appellant — approached her and asked where Jones Street was located. Because the man was a stranger, Betty responded "No." Appellant then dragged her through the church *Page 64 
door on Stone Street, into a room, and raped her. Appellant then released Betty and left the building.
After her release, Betty went to the school bus stop and there located her mother. By the time Betty returned, she had been away from her mother less than one-half hour.
After the incident, Betty and her mother went to the home of Betty's cousin, Doris Lee, and the police were called. Betty described her assailant to the investigating officer, Joseph Arone, and explained that she had seen the man on a previous occasion.[3] Officer Arone then took Betty to the Cumberland Church, where she identified the room in which the rape occurred.
Betty was subsequently taken by Inspector Margaret Hartmann to the Hall of Justice, where she was asked to look through a mug book. She immediately identified appellant, whose photograph was in the book as a result of the earlier Florence C. incident.
Around 3 p.m. on the afternoon of the rape, appellant was arrested by Inspectors Hartmann and Kevin O'Connor as he walked down Powell Street toward his residence. He was wearing the blue jacket identified by Betty. Semen was found on the underpants, pants and shirt worn by appellant at the time of his arrest. It was of a type consistent with the semen found on Betty's panties; thus, according to the testimony of police criminalists, appellant could not be excluded as the perpetrator, although such consistency of type did not, of course, conclusively prove appellant's guilt.
Appellant offered evidence in an effort to negate his identification as Betty's rapist. According to his testimony, on March 10, 1978, he was scheduled to work the 7 a.m.-3 p.m. shift at Davre's restaurant, located in the Bank of America Building on Kearny. The previous night, he had worked the 10 p.m. to 6 a.m. shift at the Sugar Plum restaurant in San Francisco with his wife, Anna. *Page 65 
Appellant testified that he and his wife punched out at the Sugar Plum at 6:08 a.m. on March 10. After dropping fellow employees off at two locations in San Francisco,[4] appellant and his wife drove to their residence. On the way home, appellant realized that he did not have his wallet, so he double parked, went inside his apartment, called the manager of the Sugar Plum, and was told that his wallet had been found in the employee's dressing room. Appellant then had a cup of tea, and left to park the car and walk to work at Darve's at approximately 6:50 a.m.
Appellant further testified that he had some difficulty finding a parking space, finally parking on Pacific (between Mason and Taylor). From there, he walked to work, taking a route that did not pass by Stone Street or the Cumberland Church. Appellant's time card showed that he punched in to work at Davre's at 7:14 a.m. Appellant denied any contact with Betty.
Anna Poon also testified on appellant's behalf at trial. She corroborated appellant's testimony to the point at which he left for work at Davre's, after which she did not see him. She also testified, as did appellant, that they had intercourse in the afternoon of March 9, 1978; that appellant wore his underpants both before and after the sex act, and after sleeping for a while, put on the same clothes which he had been wearing.
(1) Appellant's first contention is that he was denied his right to a speedy trial under Penal Code section 1382 because he was not tried within 60 days of the filing of the initial information. The procedural chronology of the case reveals the following: Information No. 96176 — charging appellant for offenses relating to the Florence C. incident — was filed on February 14, 1978; appellant was arraigned on the information on February 17, and trial was set for April 3; on March 29 the indictment (No. 96616) — charging appellant with offenses relating to both incidents — was filed; on March 31, appellant's motion for a two-week continuance on the information — which still would have allowed trial to commence within the statutory period — was denied as moot, and, pursuant to Penal Code section1385, the information was dismissed on the prosecution's motion; trial began on May 8. *Page 66 
Appellant claims that the 60-day statutory period began to run as of the date on which the original information was filed, February 14, 1978, thereby making the trial date of May 8 untimely. The People insist that the filing of the indictment started a new 60-day period under section 1382, so that the trial date did not violate the statutory speedy trial requirements. Thus, the issue is whether the filing of an indictment, followed by the dismissal of an earlier-filed information, triggers a new 60-day period for purposes of section 1382.
Section 1382, subdivision 2 provides that a criminal action must be dismissed "When a defendant is not brought to trial in superior court within 60 days after the finding of the indictment or filing of the information. . . ." "The basic policy underlying the constitutional provision is to protect the accused from having criminal charges pending against him an undue length of time." (People v. Godlewski (1943) 22 Cal.2d 677, 682 [140 Cal.Rptr. 381].)
Here, appellant was tried within 60 days of the filing of the indictment, so that the criminal charges contained in that accusatory pleading were not pending against him for more than the statutory period of time. When the information was dismissed — prior to 60 days following its filing — the charges stated therein were no longer pending or relevant. (People v.Godlewski, supra, 22 Cal.2d at pp. 682-683.) Consequently, those original charges did not burden appellant for an unreasonable or unlawful length of time. (People v. Godlewski,supra, at p. 683.)
It has been consistently held that the filing of a new indictment or information commences a separate prosecution and reinstates a new 60-day statutory period within which a defendant must be brought to trial pursuant to section 1382. (Bellizzi v.Superior Court (1974) 12 Cal.3d 33, 38 [115 Cal.Rptr. 52,524 P.2d 148]; People v. Godlewski, supra, 22 Cal.2d 677, 683;People v. Sahagun (1979) 89 Cal.App.3d 1, 16 [152 Cal.Rptr. 233] ; People v. Willis (1978) 84 Cal.App.3d 952, 956 [149 Cal.Rptr. 301]; People v. Allen (1963) 220 Cal.App.2d 796, 800 [34 Cal.Rptr. 106]; People v. Wilkes (1960) 177 Cal.App.2d 691, 697 [2 Cal.Rptr. 594].) As explained in People v. Faulkner (1972)28 Cal.App.3d 384 [104 Cal.Rptr. 625]: "It is well settled that the dismissal of a felony prosecution under the above cited sections does not bar a prosecution for the same offense [citations], and the 60-day period is reinstated after the filing of the new information or indictment whether *Page 67 
or not a new or different charge is involved [citations]." (Id., at p. 395.)[5]
Appellant submits that the rule allowing reinstatement of the 60-day period upon the filing of a new accusatory pleading should not be applicable where, as here, the initial charging document is not dismissed until after the second pleading is filed. In such a situation, appellant argues, there is a continuity of the charges so that the statutory period prescribed in section 1382
must run from the date of the originally filed action.
In support of this proposition, appellant cites People v.Schlosser (1978) 77 Cal.App.3d 1007 [144 Cal.Rptr. 57], in which it was held that for purposes of the bar against prosecution after dismissal of a second action for the same offense stated in Penal Code section 1387,[6] a second information dismissed (in the interests of justice) after the filing of an indictment covering the same charges did not constitute a second dismissal of the action. (Id., at p. 1011.)
We do not find Schlosser dispositive here. In Schlosser,
the court's conclusion was based upon its interpretation of the purpose of section 1387 — to achieve a speedy trial by prohibiting multiple refilings following dismissals (id., at p. 1010) — and its holding was limited to that context. Here, we are concerned with section 1382, and its objective: to facilitate a speedy trial by preventing particular charges to be pending for an unreasonable length of time. (People v. Godlewski, supra,22 Cal.2d 677, 682.) Since the charges contained in the information were dismissed prior to the statutory time limit, in our view that purpose is not contravened by ruling that the filing of the indictment recommenced *Page 68 
the running of the 60-day period. We accordingly conclude that the filing of a new pleading before dismissal of original charges starts a new statutory period for purposes of section 1382 as long as the initial pleading is dismissed before the statutory period lapses. (Bellizzi v. Superior Court, supra, 12 Cal.3d 33, 38; People v. Godlewski, supra, at p. 683; People v.Faulkner, supra, 28 Cal.App.3d 384, 395.)[7]
(2) Appellant next claims that the trial court committed prejudicial error by failing to order separate trials of the two offenses. Appellant's argument is two-pronged; he claims first that the offenses were improperly consolidated under Penal Code section 954; and second that joint trial prejudiced appellant by allowing evidence pertaining to one incident to be admitted and considered in relation to the other.
We find no merit in the first of these arguments. Section 954
specifically allows an accusatory pleading to charge "two or more offenses connected together in their commission . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . .; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . ." For purposes of joinder, offenses are deemed to have been connected together in their commission, where there exists "a common element of substantial importance in their commission," even though the offenses charged do not relate to the same transaction and were committed at different times and places against different victims. (People v. Polk (1964) 61 Cal.2d 217, 230 [37 Cal.Rptr. 753, 390 P.2d 641]; People v. Fulton
(1980) 109 Cal.App.3d 777, 782 [167 Cal.Rptr. 436]; Ghent v.Superior Court (1979) 90 Cal.App.3d 944, 958 [153 Cal.Rptr. 720] .) Offenses are of the "`same class'" if they possess "common characteristics or attributes." (People v. Meneley (1972)29 Cal.App.3d 41, 51 [105 Cal.Rptr. 432].) *Page 69 
The offenses joined here share numerous "common elements"; the most significant being sexual motivation and young girl victims. Thus, the offenses were "connected together in their commission" for purposes of section 954. (People v. Matson (1974)13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]; Ghent v.Superior Court, supra, 90 Cal.App.3d 944, 958; People v.Conrad (1973) 31 Cal.App.3d 308, 315 [107 Cal.Rptr. 421].)
In addition, the charges based upon the Florence C. incident are of the "same class of offense" as the counts related to the Betty N. assault. All charges involve "assaultive crimes against the person," and consequently are considered "of the same class" under section 954, (People v. Rhoden (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143]; Coleman v. SuperiorCourt (1981) 116 Cal.App.3d 129, 135 [172 Cal.Rptr. 86];People v. Meneley, supra, 29 Cal.App.3d 41, 51-52.)
(3) As the statutory requirements for joinder were clearly met here, appellant can predicate error only on a clear showing of prejudice. (People v. Kemp (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913]; People v. Meneley, supra,
29 Cal.App.3d at p. 52.) This is his second argument.
If established, prejudice may require severance, even though joinder of the offenses is permissible under section 954. As explained in Coleman v. Superior Court, supra, 116 Cal.App.3d 129, 135: "The determination that the offenses are `joinable' under section 954 is only the first stage of analysis because section 954 explicitly gives the trial court discretion to sever offenses or counts `in the interest of justice and for good cause shown.' . . . `. . . Refusal of severance may be prejudicial error if discretion is abused.' (People v. Blalock (1965)238 Cal.App.2d 209, 222. . . .)"
Prejudice is not assumed, however, but must be clearly established by the party seeking severance. (People v.Meneley, supra, 29 Cal.App.3d 41, 52.) And our high court has noted that "`[w]here the consolidation meets the test of joinder,' as it does here, `the difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion.'" (People
v. Matson, supra, 13 Cal.3d 35, 39; see also People v.Rhoden, supra, 6 Cal.3d 519, 525, fn. 2; People v. Fulton,supra, 109 Cal.App.3d 777, 782.) *Page 70 
(4a) Appellant claims that a joint trial permitted the prosecution to use the evidence of the Betty N. rape to establish intent (the sole issue) in the Florence C. case, and to buttress the showing of identity (the sole issue) in the Betty N. case by reference to testimony relevant to the Florence C. matter. Had severance been granted, appellant argues, evidence pertinent to one case would not have been admissible in the other under the rules limiting the use of prior similar acts (Evid. Code, § 1101, subds. (a) and (b)), so that consolidation prejudiced his defense by allowing the prosecution to avoid these evidentiary restrictions and use the strongest element of each case to support the weakest point of the other.
Evidence Code section 1101, subdivision (a), provides generally that evidence which establishes a person's character or trait of character, such as evidence that a person has committed prior crime or acts of misconduct, is inadmissible when offered to prove conformable conduct on a specific occasion. However, subdivision (b) of section 1101 provides that character trait evidence in the form of prior wrongful acts is admissible to prove some fact other than a person's propensity to commit a particular crime.[8] (People v. Finney (1980) 110 Cal.App.3d 705, 715 [168 Cal.Rptr. 80]; People v. Thompson (1979) 98 Cal.App.3d 467, 474 [159 Cal.Rptr. 615].)
(5) It is now well established that evidence of prior acts is admissible if it has relevance to the issues of the identity or intent of the perpetrator. (People v. Thompson (1980)27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883]; People v.Thomas (1978) 20 Cal.3d 457, 465 [143 Cal.Rptr. 215,573 P.2d 433]; People v. Kelley (1967) 66 Cal.2d 232, 241-242 [57 Cal.Rptr. 363, 424 P.2d 947]; People v. Haslouer (1978)79 Cal.App.3d 818, 826 [145 Cal.Rptr. 234]; People v.Whittington (1977) 74 Cal.App.3d 806, 815 [141 Cal.Rptr. 742];People v. Hunt (1977) 72 Cal.App.3d 190, 200 [139 Cal.Rptr. 675] .) As declared in People v. Thomas, supra, "Ordinarily, evidence of a common design or plan would bear either on the issue of the defendant's *Page 71 identity as the perpetrator of the charged offense, or the defendant's intent to commit that offense." (20 Cal.3d at p. 465; see also People v. Haslouer, supra, at p. 826.) Since the issues of identity and intent were at issue in the present case, the "other offenses" evidence was offered for a proper purpose here.
(6) However, admission of evidence of other crimes cannot be justified by merely asserting an admissible purpose; the question remains whether the particular evidence of defendant's other offenses is relevant to the ultimate fact in dispute. (People
v. Thompson, supra, 27 Cal.3d 303, 319; People v. Guerrero
(1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366].) Because there is inherent danger of prejudice to the accused when evidence of an uncharged offense is given to the jury, such evidence must be received with caution (People v. Thomas,supra, 20 Cal.3d 457, 466), and admitted only when its probative value outweighs its prejudicial effect. (People v.Thompson, supra, at pp. 317-318; People v. Haslouer, supra,79 Cal.App.3d 818, 825.)
(7) Consequently, to be admissible under section 1101, subdivision (b), the "other offense" offered as evidence must satisfy certain foundational requirements; it must be (1) "similar" to the crime charged; (2) not remote in time; and, (3) not merely cumulative with respect to other evidence which the People may use to prove the same issue. (People v. Thomas,supra, 20 Cal.3d 457, 465; People v. Vidaurri (1980)103 Cal.App.3d 450, 462 [163 Cal.Rptr. 57].) (4b) Appellant claims that the two incidents here in question do not bear the requisite similarity to each other; that is, they do not share sufficient "distinctive common marks."[9] (People v. Haston (1968)69 Cal.2d 233, 245-246 [70 Cal.Rptr. 419, 444 P.2d 91].)
The test of similarity is "`whether there is some clear connection between . . . [the other] offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other. Or as the matter is sometimes stated, the other offenses . . . are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they [sic] warrant the inference that if the defendant committed the other acts he committed the acts charged. . . .'" (People v. Thomas, supra, 20 Cal.3d 457, 465; see also People v. Haslouer, supra, 79 Cal.App.3d 818, 826; People v. *Page 72 Whittington, supra, 74 Cal.App.3d 806, 815.) In ruling upon this issue, we "`[m]ust examine the precise similarity between the offenses with respect to the issue for which the evidence is proferred and satisfy . . . [ourselves] that each link of the chain of inference between the former and the latter [offenses] is reasonably strong.'" (People v. Thompson, supra, 27 Cal.3d 303, 316.)
Here, the issues are identity and intent. Consequently, as explained in People v. Matson, supra, 13 Cal.3d 35, 40: ". . . evidence of uncharged offenses is ordinarily admissible if it discloses a distinctive modus operandi common both to the charged and uncharged offenses. [Citations.] A modus operandi gives rise to a reasonable inference that the charged and uncharged offenses were committed by the same person when the marks common to those offenses set them apart from other offenses of the same general variety. [Citations.] `If the inference is weak, the probative value is likewise weak, and the court's discretion should be exercised in favor of exclusion.' [Citation.]" (See also People
v. DeRango (1981) 115 Cal.App.3d 583, 588 [171 Cal.Rptr. 429].)
A number of similarities between the two jointly tried incidents are evident here: (1) both involved sexual assaults upon juvenile Chinese girls, (2) initial contact was made with the victims by asking where a particular street was located, (3) both crimes occurred in the same area of the city, (4) both acts were perpetrated in unoccupied public buildings, (5) the perpetrator wore the same jacket on both occasions, and (6) the offenses occurred less than three months apart, with appellant first making contact with Betty about the time of the assault on Florence.
A case quite similar to this one is People v. Matson,supra, 13 Cal.3d 35, where rape and burglary charges were consolidated: As to the rape count, the issue, as here, was the identity of the perpetrator, while with respect to the burglary offense the sole issue was the defendant's intent. There was a common modus operandi in the crimes, committed 11 days apart: lying in wait for lone women making repeated trips from their unlocked residences to load or unload their cars. The court concluded: "The modus operandi here is sufficiently distinctive to warrant an inference of identity under the standard set forth in People v. Haston, supra, 69 Cal.2d 233, 244-250. Therefore, had these charges been severed and separately tried, evidence of the burglary would have been admissible in the rape trial on the issue of identity, just as evidence of the rape would have been admissible in the burglary trial on the issue of intent. (See, *Page 73 
e.g., People v. Beamon, supra, 8 Cal.3d at pp. 632-633.) Accordingly, denial of the severance motion was proper." (Id.,
at pp. 40-41.)[10]
Here, as in Matson, the offenses have a sufficient degree of similarity so that it may be logically inferred from the evidence in the rape case that appellant entertained the requisite sexual intent in assaulting Florence. Similarly, the attack on Florence creates at least an inference that appellant was the perpetrator of the rape. (People v. Matson, supra, 13 Cal.3d 35, 40-41;People v. Cramer (1967) 67 Cal.2d 126, 130 [60 Cal.Rptr. 230,429 P.2d 582]; People v. Goodson (1978) 80 Cal.App.3d 290, 294-295 [145 Cal.Rptr. 489]; People v. Whittington, supra,74 Cal.App.3d 806, 815-816.)
There are, quite obviously, certain dissimilarities between the offenses, most notably the time of their commission and the ultimate result — which may have been due to the arrival of Patrick upon the scene during the assault of Florence. However, as noted in both People v. Matson, supra, and more recently in Coleman v. Superior Court, supra, 116 Cal.App.3d 129, 138-139: "`The judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses. . . . In both cases the probative value of considering one alleged offense in light of another must be weighed against the prejudicial effect, but additional factors favor joinder. "Joinder of unrelated charges . . . ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials."'" Thus, a "ruling on a motion to sever is based on a weighing of the probative value as against the prejudicial effect, but in the weighing process the beneficial results from joinder are added to the probative-value side. This requires the defendant to make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (Coleman v.Superior Court, supra, at p. 139.) *Page 74 
In Coleman, the court applied the aforementioned liberal standards, but ruled that the lower tribunal abused its discretion in refusing to sever two sets of offenses based upon sexual assaults on juvenile girls from dissimilar rape andmurder charges involving an adult victim. The court particularly stressed the dissimilarity of the cases and the "highly inflammatory" nature of sex crimes against children, which, when joined with another crime against an adult had "a very serious prejudicial effect upon a jury; . . ." (Id., at p. 139.)
Similarly, in People v. Guerrero, supra, 16 Cal.3d 719, relied upon by appellant, our high court concluded that evidence of a prior uncharged rape was improperly admitted to prove identity or intent in a murder case, although the charged and uncharged crimes were factually similar in a number of respects.[11] In ruling the evidence inadmissible, the court primarily focused upon the fact that no evidence of "sexual activity" was found in the murder case. (Id., at pp. 725-727.) For that reason, the offenses were deemed insufficiently similar for the prior rape to have probative value in the murder case. (Id., at pp. 728-729.)
We find the present case is distinguishable from bothGuerrero and Coleman in the central respect that, here, sexual activity associated with juvenile victims characterized both offenses. Additional similarities make the evidence in each case probative in the other. (People v. Jackson (1980)102 Cal.App.3d 620, 625-626 [162 Cal.Rptr. 574].) We therefore conclude that the trial court did not abuse its considerable discretion in failing to sever trial of the similar offenses. (People v. Matson, supra, 13 Cal.3d 35, 40-41.)
(8) Appellant also argues that the trial court improperly responded to an interrogatory of the jury regarding consideration of other offenses evidence. *Page 75 
The record shows that a limiting instruction on the other crimes evidence (pursuant to CALJIC No. 2.50) was neither requested by appellant nor given by the trial court. After deliberation, the jury asked the court if it could "infer a pattern from one of the two cases in order to judge the evidence in the other case." The court was concerned about "the idea of a pattern," but consulted with counsel on the issue. The prosecution suggested an instruction in terms of CALJIC No. 2.50, with modifications to fit the case.[12] Defense counsel suggested that essentially the jury was only asking if it could
infer a pattern from the other offense evidence, not if it was forced to make such an inference. Defense counsel expressed agreement with the trial court's assessment of the question, and the trial court's response to the jury, which was, "The answer to [the question] is, you may."
Appellant submits that this "instruction" contravened Evidence Code section 1101, subdivisions (a) and (b), and CALJIC No. 2.50, which allow other crimes evidence to be admitted only for limited purposes. In support of this position, appellant cites People
v. Swearington (1977) 71 Cal.App.3d 935 [140 Cal.Rptr. 5], in which it was held that if the court instructs in the terms of CALJIC No. 2.50, the instruction must be limited to those issues — here identity and intent — upon which the evidence is admissible. (Id., at p. 949.) Appellant asserts that the trial court committed prejudicial error by failing to offer such a limiting instruction.
We find appellant's argument unpersuasive for a number of reasons. First, appellant made no request for a limiting instruction, and case law has established that the instruction is not one which must be given sua sponte. (People v. Haylock
(1980) 113 Cal.App.3d 146, 150 [169 Cal.Rptr. 658]; People v.Panky (1978) 82 Cal.App.3d 772, 777 [147 Cal.Rptr. 341];People v. Simms (1970) 10 Cal.App.3d 299, 310-311 [89 Cal.Rptr. 1].) Further, appellant waived any error by failing to seek an appropriate admonishment and expressing agreement with the trial court's response. (People v. Morrisson (1979)92 Cal.App.3d 787, 790-791 [155 Cal.Rptr. 152]; People v. Harris
(1977) 71 Cal.App.3d 959, 966 [139 Cal.Rptr. 778].)
Moreover, when considered in the context in which it was made, we find the trial court's response to the jury proper. By informing the jury *Page 76 
that it "may consider evidence of one set of offenses to establish a pattern relevant to the other, the court was expressing a correct application of the law; similar offenses are relevant to prove a "pattern, scheme or plan. . . ." (People v.Cramer, supra, 67 Cal.2d 126, 130; People v. Hunt (1977)72 Cal.App.3d 190, 203 [139 Cal.Rptr. 675].) Without a request for a limiting instruction, and given the nature of the question, the court's response instructing the jury that it could, if so inclined, consider the evidence in one case as establishing a pattern in the other, was not error.
People v. Swearington, supra, 71 Cal.App.3d 935, cited by appellant, does not compel a different result. Swearington
merely holds that, if given, CALJIC No. 2.50[13] must be modified so as to instruct that "other crimes" evidence be considered only on questions actually at issue. (Id., at pp. 948-949.) However, if not requested, as here, the limiting instruction need not be given. (People v. Haylock, supra,113 Cal.App.3d 146, 150.) Therefore, we conclude that the trial court did not erroneously respond to the question of the jury regarding its consideration of the other crimes evidence.
(9a) Appellant's next contention is that the pretrial photoidentification of appellant by Betty should have been excluded by the trial court because the photographic display shown to the victim was impermissibly suggestive.
The facts pertinent to this issue are not in dispute. On the afternoon of March 10, the day she was assaulted, the victim was shown a police mugbook by Vice Inspector Margaret Hartmann. At this time, appellant was not yet a suspect in the case. *Page 77 
Inspector Hartmann told Betty that she did not expect her assailant to be in the book. However, because Betty had described the suspect as being 18 to 20 years old, Hartmann opened the mugbook to the last page, containing the most recent photographs and cases.
Betty immediately selected appellant's photograph on the first page she viewed; his picture had been placed in the book after the attack on Florence. Hartmann informed Betty that she was mistaken because the person she had identified was still in jail; however, Betty insisted she was right. Inspector Hartmann then left the room, leaving Betty to peruse the book and learned appellant had been released on bail at which point she returned and Betty left.[14]
Appellant argues that this procedure was suggestive because he was the only Asian pictured on the two pages of the mugbook which Betty was first shown. Appellant also notes that only 45-60 of the 1,200 total photographs in the mugbook depicted Asians.
Under the test announced by the United States Supreme Court and adopted by our high court, a violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Simmons v. United States (1968)390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; Stovall v.Denno (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; People v. Blair (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738]; People v. Thornton (1974)11 Cal.3d 738, 762 [114 Cal.Rptr. 467, 523 P.2d 267].) "Whether due process has been violated depends upon the `totality of the circumstances' surrounding the confrontation." (People v.Blair, supra, at p. 659; People v. Burke (1980) 102 Cal.App.3d 932, 940 [163 Cal.Rptr. 4].) (10) The burden is on the defendant to show that the identification procedure resulted in such unfairness that it abridged his rights to due process. (People v. Kilpatrick (1980)105 Cal.App.3d 401, 412 [164 Cal.Rptr. 349].)
(9b) We find that the photographic display here at issue was suggestive — because appellant was the only Asian depicted — but not "impermissibly" so. (People v. Ware (1978) 78 Cal.App.3d 822, 839 [144 Cal.Rptr. 354].) The victim had ample opportunity to observe her assailant *Page 78 
both before and after the actual assault, and during a prior confrontation — even though her eyes were covered during the rape itself. She was shown the mugbook the day of the assault, and before appellant was a suspect in the case. Additionally, she refused to retract her identification even though she was initially told it was mistaken. At no time did she waver in her identification or description of appellant. Upon a consideration of the totality of circumstances, we find no likelihood of an erroneous identification in the pretrial identification procedure at issue here. (People v. Rist (1976) 16 Cal.3d 211, 217 [127 Cal.Rptr. 457, 545 P.2d 833]; People v. Hicks (1971) 4 Cal.3d 757, 764 [94 Cal.Rptr. 393, 484 P.2d 65]; In re Charles B.
(1980) 104 Cal.App.3d 541, 545 [166 Cal.Rptr. 729]; People v.Dudley (1978) 81 Cal.App.3d 866, 870 [146 Cal.Rptr. 767];People v. Ware, supra, 78 Cal.App.3d at pp. 839-840.)[15]
(11) Appellant also complains that the trial court erred in refusing to allow him to stipulate to the fact that Betty had been raped. According to appellant, prejudice resulted from the introduction of detailed testimony of medical personnel which corroborated the fact of the rape — in particular the "inflammatory" evidence of the painful physical examination of the victim by Dr. Sollenberger — which would not have been relevant had the stipulation been accepted.
In support of this argument, appellant relies upon the recent decision in People v. Hall (1980) 28 Cal.3d 143
[167 Cal.Rptr. 844, 616 P.2d 826], where it was held that in a prosecution for violating Penal Code section 12021 (being an ex-felon in possession of concealed firearm), evidence reflecting upon the element of a prior felony conviction may not be given to the jury if the accused stipulates to it, unless the facts to which the defendant has offered to stipulate retain some probative value. (Id., at p. 152.) The court ruled that ". . . if a defendant offers to admit the existence of a charged offense, the prosecutor must accept *Page 79 
that offer and refrain from introducing evidence of other crimes to prove that element to the jury." (Ibid.) By analogy toHall, appellant claims that appellant's proferred stipulation to the fact of rape should have been accepted by the prosecution and the trial court, rendering the prejudicial medical evidence irrelevant.
While we conclude that Hall has general application to the present case (People v. Washington (1979) 95 Cal.App.3d 488
[157 Cal.Rptr. 58]), we consider that forcing such a stipulation upon the prosecution here would have been improper under a well-recognized exception which holds that, "A prosecutor is not required to stipulate to the existence of any elements of the crime he is attempting to prove where the stipulation will impair the effectiveness of the prosecutor's case and foreclose his options to obtain a conviction under differing theories." (People v. Robles (1970) 2 Cal.3d 205, 213 [85 Cal.Rptr. 166,466 P.2d 710]; People v. Washington, supra, at p. 492.) If evidence retains some probative value in spite of the stipulation or if the stipulation would "force the prosecution to elect between theories of guilt, or would hamper a coherent presentation of the evidence on the remaining issues, evidence of the stipulated facts is admissible." (People v. Hall, supra,28 Cal.3d 143, 153.)
The medical evidence here at issue was relevant for reasons other than simply to establish the fact of rape. Although appellant's stipulation would have removed the fact of rape as a disputed issue in the case, the medical evidence remained important to corroborate Betty's testimony and present a coherent total picture of the evidence. And if it was graphic, and brutal, so objectively was the vicious crime it described.
In our view, if the prosecutor had been forced to accept the stipulation here, the impact of the state's case and evidence would have been drained and compromised. Consequently, the trial court acted properly in refusing to require acceptance of appellant's proferred stipulation. (People v. McClellan
(1969) 71 Cal.2d 793, 802 [80 Cal.Rptr. 31, 457 P.2d 871];People v. Pollock (1938) 25 Cal.App.2d 440, 444 [77 P.2d 885].)[16]
We further conclude that even if it had been error to reject the stipulation and admit the medical testimony which corroborated the fact of *Page 80 
rape, such error was harmless beyond a reasonable doubt. Since the only issue in the rape case was the identity of the perpetrator, it is our view that admission of the medical testimony, which did not reflect upon the identity issue, was not so prejudicial as to require reversal under the standard set forth in People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (People v. Hall, supra, 28 Cal.3d 143, 157-158;People v. McClindon (1980) 114 Cal.App.3d 336, 341 [170 Cal.Rptr. 492].)
(12) Appellant next argues that the failure of the trial court to instruct the jury that the misdemeanor offense of child molestation (Pen. Code, § 647a) was necessarily included in the lewd and lascivious act offense (Pen. Code, § 288) which prejudiced his case by removing that lesser offense from the jury's consideration. For that reason, appellant argues, his conviction of the lewd act charge must be reversed, as the evidence of sexual intent relating to that charge — required to establish a violation of section 647a, but not to prove the offense of child molestation — was uncertain and ambiguous.
We agree with appellant that the trial court erred in failing to instruct the jury that it could convict appellant of the lesser included child-molestation offense if it was established by sufficient evidence. (See People v. La Fontaine (1978)79 Cal.App.3d 176, 183 [144 Cal.Rptr. 729];[17] People v.Miranda (1967) 254 Cal.App.2d 517, 519 [62 Cal.Rptr. 339].) However, the error was patently harmless on the standard established.
In People v. Sedeno (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1,518 P.2d 913], where our Supreme Court declared that "[i]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the *Page 81 
jury." (Id., at p. 721.)[18] We conclude that the principle announced in Sedeno has application here, for the following reasons.
The jury was properly instructed on the charge of assault with intent to commit rape and its lesser included offense, misdemeanor assault, and proceeded to convict appellant of the greater offense. Thus, the jury necessarily resolved the intent issue in the lewd and lascivious act case adversely to appellant. Consequently, the instructional error was not prejudicial because it did not remove a material issue from the consideration of the jury. (People v. Sedeno, supra, 1 Cal.3d 703, 721; People
v. Eaker (1980) 100 Cal.App.3d 1007, 1013 [161 Cal.Rptr. 417];People v. Miller (1974) 43 Cal.App.3d 77, 83-84 [117 Cal.Rptr. 491].)
(13) Next, appellant argues that the convictions of assault with intent to commit rape and burglary are not supported by sufficient evidence of appellant's intent to rape Florence. Appellant emphasizes that the only evidence of sexual intent consisted of the testimony of the victim — as to the touching of her buttocks by appellant — which testimony was in conflict.
The rules governing appellate review of the evidence supporting a criminal conviction are well established. In People v.Johnson (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738], the court recently reiterated: "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (Id., at p. 578.) Moreover, "When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal." (People v.Matson, supra, 13 Cal.3d 35, 41.) Finally, as noted in People
v. Thornton, supra, 11 Cal.3d 738, 754: "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." *Page 82 
We conclude that the testimony of Florence, corroborated to some degree by that of her brother Patrick, along with the evidence of the similar assault on Betty, provides ample evidentiary support for the finding of sexual intent necessary to sustain the assault with intent to commit rape and the burglary convictions.
(14) Appellant also contends that the trial court gave erroneous and prejudicial advice to the jury in response to the following question asked of the judge on the second day of jury deliberations: "Please clarify; does a unanimous guilty verdict on a lesser included offense exonerate the defendant of the greater charge if there is no unanimous verdict on the greater charge?" The trial court answered the jury by advising that a unanimous guilty verdict on the lesser charge would, in effect, exonerate the defendant of the greater offense because before even proceeding to consider the lesser offense, a unanimous "not guilty" verdict on the greater would have to be reached. The judge also advised that no verdict on the lesser charge could be submitted unless the jury first reached a unanimous "not guilty verdict" on the greater offense.
Appellant submits that such response improperly instructed the jury "as to how to proceed if they were in fact unable to reach a verdict on the greater charge," and thus placed "excessive pressure on dissenting jurors to acquiesce in a verdict" in contravention of the California Supreme Court's decision inPeople v. Gainer (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861,566 P.2d 997, 97 A.L.R.3d 73].
We do not find the ruling in Gainer dispositive in the present case. In Gainer, the court disapproved of the "Allen" instruction — pursuant to which minority jurors were admonished to rethink their position in light of the majority view and with a realization that the case had to be ultimately decided. This was found to have had a coercive impact upon minority jurors, causing them to consider improper factors in reaching a verdict. (Id., at p. 850.)
The trial court's instruction here had no such coercive effect; the jurors were merely told that a conviction of a lesser offense could not be properly used as a "compromise verdict," and that total agreement on acquittal of the greater charge was a prerequisite to a unanimous verdict of guilt on the lesser charge. Such an admonishment placed no undue pressure upon dissenting jurors to convict appellant of the greater offenses. *Page 83 
(15a) The instruction was a correct statement of the law. (Pen. Code, § 1159.)[19] As explained in People v.Doolittle (1972) 23 Cal.App.3d 14, 19-20 [99 Cal.Rptr. 810]: "A jury may find a defendant guilty of an included offense (Pen. Code, § 1159), and a finding that the defendant is guilty of the lesser included offense necessarily constitutes a finding of not guilty of the greater offense. [Citations.] A person cannot be convicted of both the included and the greater offense because, in essence, only one offense is committed. [Citations.] Accordingly, it follows that, since only one offense can be committed where the offense contains a necessarily included offense, a finding of not guilty is an acquittal of the included offense as well as the greater offense. [¶] In view of the foregoing principles we apprehend that in the trial of an offense which necessarily includes a lesser offense, as was the case here, the jury, before they can return a verdict, must on the one hand, agree that the defendant is guilty of the offense charged or any included offense or, on the other hand, agree that he is not guilty of any offense, whether the greater or the lesser."
We therefore conclude that the trial court properly advised the jury, in response to its question, that a guilty verdict on the lesser charge would imply a previously agreed upon verdict of not guilty of the greater offense. (In re Hess (1955) 45 Cal.2d 171, 176 [288 P.2d 5].)
Appellant next cites two instances of prosecutorial misconduct which he submits necessitate reversal of the judgment.
First, appellant claims that the prosecutor committed misconduct by asking the coroner if appellant ever volunteered a blood sample, after the trial court expressly denied as untimely the prosecution's motion, made during trial, for an order requiring the defendant to submit to a blood and saliva test.[20] At trial, appellant's counsel immediately objected to the question. The objection was sustained, and the question was never answered. Defense counsel moved for dismissal with prejudice. The motion was denied, but the court admonished the jury to neither draw any inference of guilt even if it believed appellant did not offer a blood sample, nor discuss that fact in its deliberations. *Page 84 
(16a) Second, appellant objects to the prosecutor's question asking him: "You have not stated to anyone other than your lawyer that [Florence] was lying on her back before you came to court today." The question was asked in response to appellant's testimony that Florence was on her back rather than her stomach — as she had testified — during the incident in the garage. Defense counsel objected to the question on the ground that it infringed upon appellant's right to remain silent. The objection was sustained, although appellant's motion for dismissal was denied, and the jury was instructed that appellant was under no obligation to give any statements to the police other than those actually given.
(15b) The prosecutor's question regarding appellant's failure to volunteer a blood sample was clearly improper. Appellant was under no obligation to voluntarily offer a blood sample, and the prosecution's motion to obtain one had been denied as untimely. Moreover, it had been agreed among the parties that no reference to the ABO blood-semen testing would be made at trial. The prosecutor's attempt to place evidence before the jury which had been ruled inadmissible constituted misconduct. (People v.Johnson (1978) 77 Cal.App.3d 866, 873 [143 Cal.Rptr. 852].)(16b) We find no merit, however, in appellant's claim that the prosecutor improperly commented upon his failure to make a statement, though we acknowledge the well-established rule that testimony which refers, either directly or indirectly, to a defendant's failure or refusal to make a statement, generally amounts to misconduct for the reason that it deprives a criminal defendant of the right to remain silent. (Doyle v. Ohio
(1976) 426 U.S. 610, 619 [49 L.Ed.2d 91, 422, 96 S.Ct. 2240];People v. Cockrell (1965) 63 Cal.2d 659, 669 [47 Cal.Rptr. 788,408 P.2d 116]; People v. Gaines (1980) 103 Cal.App.3d 89, 96 [162 Cal.Rptr. 827]; People v. Andrews (1970)14 Cal.App.3d 40, 47 [92 Cal.Rptr. 49].)
Once appellant freely chose to cooperate with the police and offer his version of the incident, the prosecutor was entitled to cross-examine him concerning his in-court testimony, which was inconsistent with prior statements or silence. (People v.Hill (1980) 110 Cal.App.3d 937, 943-944 [168 Cal.Rptr. 272];People v. Barker (1979) 94 Cal.App.3d 321, 329-330 [156 Cal.Rptr. 407]; People v. Love (1977) 75 Cal.App.3d 928, 934 [142 Cal.Rptr. 932]; People v. Farris (1977) 66 Cal.App.3d 376, 390 [136 Cal.Rptr. 45].) The failure of appellant to exercise his right to remain silent distinguishes the present case from Doyle. (People v. Redmond (1981) 29 Cal.3d 904, 910-911 [176 Cal.Rptr. 780, 633 P.2d 976]; People v. Hill,supra, at p. 943; People v. Barker, supra, at *Page 85 
p. 329.) In light of that distinguishing feature we conclude that no misconduct is found in the prosecutor's reference to information which appellant failed to give the police but about which he subsequently testified at trial. (Ibid.)
(15c) We also conclude that the prosecutor's improper reference to the blood sample was not prejudicial. Under traditional application of the state's harmless error rule (People v. Watson, supra, 46 Cal.2d 818, 836), the test of prejudice is whether it is "reasonably probable that a result more favorable to the defendant would have occurred" had the district attorney refrained from the comment challenged. (People v. Bolton (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141,589 P.2d 396]; People v. Patino (1979) 95 Cal.App.3d 11, 29 [156 Cal.Rptr. 815].) The misconduct here at issue was trivial — it did not directly touch upon the issue of appellant's guilt or innocence — and any prejudicial effect was overcome by the trial court's curative admonition. We therefore find that no miscarriage of justice resulted from the misconduct. (People v.Rocha (1971) 3 Cal.3d 893, 901-902 [92 Cal.Rptr. 172,479 P.2d 372]; People v. Ryan (1981) 116 Cal.App.3d 168, 184 [171 Cal.Rptr. 854]; People v. Maese (1980) 105 Cal.App.3d 710, 719 [164 Cal.Rptr. 485].)
Appellant's final claim is that the trial court erred in imposing consecutive sentences for the offenses. Appellant argues that if the cases were properly consolidated for trial because they were "connected in their commission," consecutive sentences could not be imposed on the ground that the incidents were separate and independent. We disagree.
The standards for consolidation and consecutive sentencing are neither equivalent nor even analogous. The imposition of consecutive sentences for the assault on Florence and the rape of Betty was justified under rule 425(a) of the California Rules of Court, which specifically provides for sentencing where, as here, the following criteria exist: "[t]he crimes involved separate acts of violence or threats of violence," "multiple victims," or "were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." Pursuant to rule 425(a), we find that the imposition of consecutive terms for the offenses was proper, and fully justified by the atrocious circumstances attending appellant's actions. (See People v. Harvey (1979)25 Cal.3d 754, 759 *Page 86 
[159 Cal.Rptr. 696, 602 P.2d 396]; People v. Vizcarra (1980)110 Cal.App.3d 858, 865 [168 Cal.Rptr. 257].)
The judgments are affirmed.
Racanelli, P.J., and Elkington, J., concurred.
A petition for a rehearing was denied November 25, 1981, and appellant's petition for a hearing by the Supreme Court was denied January 20, 1982.
[1] To corroborate his testimony regarding the auto parts transaction, appellant produced an order form which he had placed with the dealer. A sales representative from the dealership also confirmed appellant's order, and testified that appellant was a regular customer.
[2] Appellant's testimony in this regard was contradicted by that of Patrick, which was that appellant opened the door to the Clay Street garage with a key, thereby indicating his familiarity with it. However, appellant countered with his testimony that Patrick was mistaken about the garage door being opened with a key; he testified that the door was open at all times. Appellant's testimony on this subject was corroborated by the garage owner, Dr. Runo Bulgarelli, who explained that during December 1977, the garage door in question was malfunctioning, and for that reason was always kept open.
[3] Betty testified that the same man had approached her two or three months before this incident at the side door of the Cumberland Church as she was on her way to school. On that occasion, he told her to go inside the church, but she refused. Subsequently, Betty told her mother of this first incident, and after the March 10, 1978, attack, she identified the blue jacket worn by appellant on that date — which was also worn by him on the date of the Florence C. incident — as the one worn when he approached her the first time at the church.
[4] This was confirmed by the testimony of the coworkers.
[5] In Faulkner, an original information was filed, then dismissed in the interests of justice upon motion of the district attorney, followed by the filing of a second information containing the same charges as the first. Trial was commenced more than 60 days after the first information had been filed, but well within the statutory period if tested from the filing of the second information. The defendant's speedy trial (Pen. Code, §1382) claim was rejected. (Ibid.)
[6] Section 1387 reads as follows as amended by Statutes 1975, chapter 1069: "An order for the dismissal of an action pursuant to this chapter is a bar to any other prosecution for the same offense if it is a felony and the action has been previously dismissed pursuant to this chapter, or if it is a misdemeanor; except in those felony cases where subsequent to the dismissal of the felony the court finds that substantial new evidence has been discovered by the prosecution which would not have been known through the exercise of due diligence at or prior to the time of dismissal." (Id., at p. 1009.)
[7] We note as an additional reason for denying appellant's speedy trial claim that he is unable to establish that prejudice resulted from the delay as required where a section 1382
objection is raised on appeal after judgment. (People v.Johnson (1980) 26 Cal.3d 557, 563 [162 Cal.Rptr. 431,606 P.2d 738]; People v. Wilson (1963) 60 Cal.2d 139, 152 [32 Cal.Rptr. 44, 383 P.2d 452].) Appellant claims that the joinder of offenses occasioned by the indictment resulted in substantial prejudice due to the inflammatory evidence from one case which, by reason of consolidation, was admissible in the other. However, the trial court's failure to dismiss the indictment did not cause such prejudice. Had the motion to dismiss been granted, the People could have merely refiled and started the statute running again. (People v. Grey (1972) 23 Cal.App.3d 456, 463 [100 Cal.Rptr. 245].)
[8] Evidence Code section 1101 provides in pertinent part: "(a) . . . Evidence of a person's character or trait of his character (whether in the form of an opinion, evidence of reputation, orevidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specific occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." (Italics added.)
[9] Appellant makes no claim that the other offenses evidence is remote or "merely cumulative," and clearly no such claim can be made.
[10] The court also noted: "Moreover, denial of the severance motion would not necessarily have been an abuse of discretion hadHaston not been satisfied. The judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses. `The requirements of similarity that apply to the admission of evidence of uncharged offenses [citation] are not applicable when all offenses are charged.' [Citation.] In both cases the probative value of considering one alleged offense in light of another must be weighed against the prejudicial effect, but additional factors favor joinder. `Joinder of related charges . . . ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials.' [Citation.]" (13 Cal.3d at p. 41.)
[11] The trial court in Guerrero described the similarities as follows: "(1) each offense involved the use of a maroon Pontiac Le Mans automobile, with defendant driving; (2) the victims were approximately the same age (i.e., 17); (3) on both occasions defendant initially had other males with him in the car; (4) in each offense defendant drove around the city, stopping at the same parking lot; (5) in each case the parties made stops to buy beer and wine and each time defendant drove while drinking Budweiser beer; (6) each offense involved `sexually oriented activity'; (7) both times `the defendant took or attempted to take the girl home alone'; and (8) on both occasions `the court can infer from the evidence that the defendant used a wrench.'" (16 Cal.3d at pp. 723-724.)
On appeal, the Supreme Court concluded that the sixth and seventh asserted similarities were unsupported by the evidence. (Id., at p. 723, fn. 1.)
[12] The district attorney proposed that the jury be admonished to consider the other crimes evidence only on the issues of identity and intent.
[13] The CALJIC No. 2.50 instruction, in its standard form, states: "Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial. [¶] Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] 1. The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] 2. A motive for the commission of the crime charged; [¶] 3. The existence of the intent which is a necessary element of the crime charged; [¶] 4. That the defendant had knowledge of the nature of things found in his possession; [¶] 5. That the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; [¶] 6. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."
[14] Betty subsequently identified the same picture of appellant from a photo lineup of six young Asians. This procedure was repeated at the grand jury hearing.
[15] Appellant relies upon People v. Nation (1980)26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051], in arguing the impropriety at the photographic identification procedure. However, the facts in Nation are readily distinguishable from those pertinent to the identification here. In Nation, the defendant's "mug shot" — apparently shown in the form of a single photograph — was selected by one of three witnesses, and then after discussion among the witnesses, was identified by all as the photograph most resembling the assailant. (Id., at p. 180.) The court concluded that such a procedure made the identification the product of "mutual reinforcement of opinion" among the witnesses, and thus ruled it impermissibly suggestive. The facts of the present case, particularly with regard to any reinforcement of the victim's identification, are radically different. In our view, Nation is clearly not dispositive here.
[16] In Pollock, the court rejected defendant's offer to stipulate to the act of intercourse in a rape case, a stipulation which, according to defendant, would have rendered inadmissible "all evidence tending to prove the act of sexual intercourse." (Id., at p. 444.)
[17] In LaFontaine, the court declared: "There can be no rational dissent from the fact that a violation of Penal Code section 647a — the misdemeanor annoying or molesting a minor child under the age of 18 — is necessarily included in the offense provided by Penal Code section 288 — that of willfully and lewdly committing a lewd or lascivious act upon the body of a child under the age of 14." (79 Cal.App.3d at p. 183.)
[18] In so ruling, the court overturned its prior decision inPeople v. Modesto (1963) 59 Cal.2d 722 [59 Cal.Rptr. 124,427 P.2d 788], stating: "Therefore, to the extent that Modesto and cases following it hold that the erroneous failure to give an instruction on a lesser included offense is necessarily prejudicial, even though it reasonably appears from the verdict and the instructions given that the jury rejected the evidence tending to prove the lesser offense, they are overruled." ( 10 Cal. 3d at p. 721.)
[19] Penal Code section 1159 provides: "The jury . . . may find the defendant guilty of any offense the commission of which is necessarily included in that with which he is charged."
[20] The blood and saliva samples, when compared with the semen found on the victim's pants, would have provided a more reliable test of the identity of the perpetrator of the rape than the comparison of the semen samples taken from the clothes of the victim and appellant. The prosecution's request for a blood sample was denied as untimely. *Page 87