[Crim. Nos. 29006, 29177. Second Dist., Div. Two. July 20, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFFORD ALAN HUNT, Defendant and Appellant.

**COUNSEL**

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Martin Stein, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow, William V. Ballough and Owen Lee Kwong, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COMPTON, J.**—In this consolidated matter we consider appeals from two judgments of conviction entered against defendant in the Superior Court of Los Angeles County.

In case No. A 134319 defendant was charged with a count of forcible rape and a count of forcible oral copulation. A jury found defendant guilty of the rape and not guilty of the forcible oral copulation. Sentence was to state prison. In case No. A 127654 defendant was serving a term of probation following a conviction in 1974 for, among other things, forcible oral copulation. Because of the conviction in No. A 134319, the

trial court revoked probation in No. A 127654 and ordered into execution a previously suspended state prison sentence. The latter sentence was ordered to be served consecutively to the sentence in case No. A 134319.

We reverse the judgment in case No. A 134319 for reasons which will be set forth *infra.* Since it appears that the revocation of probation and imposition of sentence in case No. A 127654 was based on the conviction in case No. A 134319 we reverse the judgment in case No. A 127654 and remand that matter to the trial court for reconsideration.

Inasmuch as the jury found that defendant did not compel the victim in this latest case to participate in an act of oral copulation by force, or threat of great bodily harm, we focus on the charge of rape in which the People alleged that defendant accomplished an act of sexual intercourse by the use of "Threats of great and immediate bodily harm accompanied by apparent power of execution," to prevent the victim from resisting.

■ The prevailing rule in California is that threats may be inferred from conduct (*People* v. *Flores,* 62 Cal.App.2d 700 [145 P.2d 318]; *People* v. *Winters,* 163 Cal.App.2d 619 [329 P.2d 743]), and that the victim need only make such resistance as will reasonably manifest her refusal to consent to the act. (*People* v. *Peckham,* 232 Cal.App.2d 163 [42 Cal.Rptr. 673]; *People* v. *Newlan,* 173 Cal.App.2d 579 [343 P.2d 618].) While generally the woman has the power to determine for herself the extent to which she feels she can safely resist (*People* v. *Stewart,* 109 Cal.App.2d 334 [240 P.2d 704]), her conduct must always be measured against the degree of force manifested and each case must be resolved on all of the circumstances present. (*People* v. *Burnette,* 39 Cal.App.2d 215 [102 P.2d 799]; *People* v. *Cook,* 10 Cal.App.2d 511 [52 P.2d 538].)

We think it important to point out that the form of rape with which defendant was charged and convicted differs from that form of rape which is committed by the actual use of physical force to subdue the female. (Pen. Code, § 261, subd. 2.) The form of rape with which we are here dealing can be committed though the victim offers no physical resistance whatsoever, when that failure to resist is the result of threats of immediate and *great bodily harm.* (Pen. Code, § 261, subd. 3; *People* v. *Frye,* 117 Cal.App.2d 101 [255 P.2d 105]; *People* v. *Cassandras,* 83 Cal.App.2d 272 [188 P.2d 546]; *People* v. *Tollack,* 105 Cal.App.2d 169 [233 P.2d 121].)

■ In that form of rape condemned by Penal Code section 261, subdivision 2, a defendant, in order to commit the offense, need only intend to and use that degree of force necessary to overcome the victim's resistance. On the other hand where the defendant's conduct is confined to the use of threats, Penal Code section 261, subdivision 3, is explicit in requiring a threat of immediate *great bodily harm.*

With these principles in mind we approach the analysis of the evidence in this case. Applying the usual rule on appeal, we set forth the facts in the light most favorable to support the judgment.

The victim, Chris, an adult female, was employed as a waitress in a restaurant in the San Fernando Valley. On the day of the occurrence she was summoned to work only to find that she was not needed. In returning to her home, her car having been left at a service station for maintenance and service, she began hitchhiking at the Balboa on-ramp to the Ventura Freeway. She got one ride part of the way and subsequently was picked up by defendant at the DeSoto on-ramp.

Defendant was driving a camper truck. When Chris got into the truck defendant indicated he was going to Thousand Oaks which was also Chris' destination. She noticed defendant had three photos of nude women affixed to the dashboard. Defendant told her his name was John and that he was a "porno" photographer.

Defendant attempted a couple of times to hold Chris' hand. Then he took her hand and placed it on the area of his private parts. He put his arm around her and pulled her toward him and down. She testified that he held her so tightly so that she was unable to raise up or move away. After a short period of time he let her up when she called his attention to a passing school bus.

She became frightened and began to cry when the defendant prepared to exit the freeway at a point some eight to ten miles from her destination at Thousand Oaks. Believing that the defendant intended to rape and kill her, she pleaded with him to not take her off into the hills and suggested as a ruse that he take her home or to a motel. The defendant relented momentarily to the extent of returning to the freeway but left the freeway at the next exit, Kanan Road. Chris became more alarmed and attempted to distract the defendant from his purpose by conversation and intoning a chant which she had learned as a member of a meditative

group, the Nicherin Shoshu. She wrote out the chant and gave it to the defendant hoping to attract his interest to it and away from her.

When a highway patrol car passed she attempted to attract attention by blowing the horn on the camper but was prevented from doing so by the defendant who became angry. He stated "What did you do that for?" She then began to believe that rape was inevitable and initiated a discussion of sex in order to attract his interest in her for the future and thus insure her survival.

Defendant turned off Kanan Road and stopped on a dirt road which dead-ended in an uninhabited area. Chris and the defendant alighted from the camper. She believed that she had no opportunity to escape because she saw no signs of people or buildings. She testified that her fear was in part generated by the fact that a friend of hers had been raped and murdered in the same area under similar circumstances.

They entered the rear of the camper and when Chris asked if she could sit by the door the defendant responded by pulling her to the front of the camper and locking the rear door.

Chris, after undressing, offered to orally copulate the defendant. According to Chris this offer was to avoid having the defendant on top of her, which might in turn put him in position to strangle her. She thought that in this way she might satisfy his sexual appetite.

Chris orally copulated the defendant. The defendant also completed an act of sexual intercourse with her. Sometime later the defendant requested that she orally copulate him again. This time the defendant took a polaroid picture of Chris performing the act.

After completion of these sexual acts defendant suggested that they have another date to which Chris feigned agreement. She wrote her phone number on the card which she had used to write out the words for her chant and gave the card to the defendant.

Chris was the first out of the camper and as she started to walk down the road the defendant followed in the camper offering to take her to where her car was being repaired. He said he did not want her raped by anybody. She agreed and the defendant drove her to the garage.

At the garage she called the chapter chief of the Nicherin Shoshu and informed her that she had been raped. She also told two people at the

car repair shop of the rape and informed her brother on her arrival home. The latter informed the police. She was taken to a hospital where a vaginal smear indicated the presence of semen. Bruises were found on her legs which bruises had not been there before the incident with the defendant. Chris was unable to recall just when or how she sustained the bruises.

Three days later while Chris was being interviewed by a sheriff's deputy, the defendant called for a date. At the suggestion of the deputy Chris arranged a meeting with defendant. When defendant appeared at the designated place he was apprehended in his camper. Torn pieces of the card on which Chris had written her phone number were later retrieved by a deputy sheriff from the police vehicle in which the defendant was placed after the arrest.

On first being questioned by the police the defendant denied being on the Ventura Freeway on the date of the alleged rape. He disavowed any knowledge of the note with the phone number and claimed the police must have planted it in the police car.

Defendant testified in his own behalf at the trial. He stated that he had given Chris a ride on the Ventura Freeway. He related that Chris had discussed chanting with him and when he asked whether he could achieve sexual relations with her by chanting she replied smilingly "That's not the goal of the organization, but go ahead and chant for it." According to defendant Chris made no objection to his taking her hand and, in fact, she had left her hand on his leg in a manner suggestive of a sexual overture. When defendant suggested that they stop Chris suggested her home or a motel. He believed that Chris was assenting to sexual relations and it was merely a question of where and when.

In the camper they both undressed and Chris suggested that the defendant give her some pointers on sex. She mentioned that she was frigid and had not been pleasing her boyfriend. She then asked if she could orally copulate the defendant. Two acts of oral copulation occurred at her suggestion and two acts of intercourse with her apparent consent.

In brief, defendant testified that the sexual acts were consented to by Chris. His story to the police and the tearing up of the telephone note were attributed to his fear in being arrested.

Accepting, as we must, the genuineness of Chris's subjective fear and lack of consent, we are still confronted with the question of whether defendant's conduct was such as to bring him within the sweep of the statute which it is alleged he violated.

Defendant did not use physical force to overpower a resisting female. Neither did he expressly utter any threats to inflict great bodily harm to the victim. It must be pointed out that, according to the *victim's* testimony, except for defendant's placing her hand on his privates and embracing her with his arm, the suggestions of engaging in sexual relations came from her. It was she who first mentioned going to a motel and it was she who initiated the proposal that she orally copulate the defendant. This undoubtedly explains the jury's verdict of acquittal on the charge of forcible copulation.

The People's theory is that the acts of sexual intercourse, however, were the result of threats which could be implied from the circumstances. Central to that theory is the factor of the victim being inside a moving vehicle which was under the control of the defendant.

When evidence of the victim is in direct conflict with that of defendant, as it is at bench, on the crucial issues of whether the victim in fact consented or whether the defendant was aware of her lack of consent, undisputed portions of the record concerning the circumstances of the encounter between the two become of importance to suggest inherent probability which point to the truth.

To mention a few, defendant and victim met in broad daylight when victim was picked up at her solicitation by defendant driving a camper at 1:20 p.m. to traverse a distance which normally would take 40 minutes but was not delivered to her destination until two hours later, and all the time was spent on the freeways and highways in a busy area except for an approximate 30 minutes spent at a secluded spot; she saw pornographic pictures on the dashboard of the camper immediately after she seated herself; defendant told her he was a pornographic photographer; except for suggesting a motel as an alternative to using the camper, she never clearly articulated any lack of consent; she did not take the license number of the vehicle and she wrote out and handed to him her correct name, address and telephone number before she left. In such a situation, when the disputed evidence is challenged by the undisputed facts, an error in a court instruction must be rigidly scrutinized.

■   Although we conclude that under the usual test on appeal the evidence was legally sufficient to support the conviction in that there was substantial evidence from which the jury who saw the witnesses and observed their demeanor, could reasonably conclude that Chris' fear was genuine and that defendant's conduct in ignoring her plea not to be driven into the hills carried an implied threat that Chris had only the choice of submitting or suffering great bodily harm, (cf. *People* v. *Tollack, supra,* 105 Cal.App.2d 169; *People* v. *Cassandras, supra,* 83 Cal.App.2d 272), we hasten to observe that the case is a very close one indeed. Thus, we are of the opinion that an error in the trial court's instructions to the jury on the use of evidence of the commission of a prior criminal offense by defendant was prejudicial and requires a reversal.

The People were permitted to introduce the testimony of another woman who claimed that defendant had forced her to orally copulate him some two years before. It was this incident which had led to his conviction in case No. A 127654. The jury, however, was not told that fact because when defendant testified he was, for impeachment purposes, simply asked if he had previously suffered an unspecified felony conviction.

It is not necessary for us to dwell on the possibility that the jury may have made the connection between the former victim's testimony and the fact of conviction,[1] nor to devote any lengthy discussion to the implications of *People* v. *Beagle,* 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1],[2] because we perceive an even more fundamental error in the use of the evidence of the prior offense.

Karen testified that on this prior occasion she was hitchhiking near the Ventura Freeway in the Woodland Hills area. Defendant driving the same camper, picked her up and, after threatening her with rape if she refused, forcibly pushed her head down on his exposed penis and thereby accomplished an act of oral copulation.

The details of that incident are not important for our resolution of the problem. Suffice to say there were sufficient similarities between defen-

[1]Defendant complains that the procedure used conveyed the impression that he had suffered two prior convictions. We think the more damaging result was possibly to convey to the jury the fact that another jury had found defendant guilty of charges growing out of the incident with Karen where only minimal force was used.

[2]The conviction of charges growing out of the incident with Karen do not, in our opinion, appear to reflect on defendant's credibility as a witness. (See *Gordon* v. *United States,* 383 F.2d 936 [127 App.D.C. 343], cited in *People* v. *Beagle, supra.*)

dant's conduct on that occasion and during the most recent incident to establish that defendant had a unique method of behavior in the location and manner of his contact with the alleged victims. Hence, the evidence may have been relevant and admissible for certain purposes, (*People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *People* v. *McMonigle,* 29 Cal.2d 730 [177 P.2d 745]; Evid. Code, § 1101, subd. (b)), such as to identify him as the perpetrator of the offense against Chris or to establish his intent to resort to force to accomplish his objective if those matters were in issue.

When that evidence was first proffered to the jury, however, the trial court instructed that it was being admitted " . . . for the sole purpose of you determining whether or not—[Chris] voluntarily submitted or agreed to these acts, or whether she did so through fear and, secondly, whether or not the fear was engendered by some sort of a statement or actions by the defendant."

Finally, when the case was submitted to the jury for decision the trial court read a modified version of CALJIC No. 2.50. The jury was told that evidence of the prior offense was admitted as tending to show "A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case." The trial court did not further explain the significance of proving a common method of operation, plan or scheme.

As we previously pointed out the crucial issue in this case is whether defendant's conduct carried with it implied threats of great bodily harm or, said another way, whether Chris' subjective fear and her lack of resistance was reasonably induced by acts of the defendant.

Even the most subjectively determined rapist cannot be convicted of rape if without any use of threat or force he persuades a female to consent, and on the other hand, even the most subjectively frightened female cannot consent to intercourse and then claim to have been raped when that fear does not have a reasonable basis in the overt actions of the alleged rapist.

It seems self-evident that in the case at bar, defendant's conduct with Karen bore no relevancy to the question of whether his conduct with Chris was such as to engender a reasonable fear of rape and immediate bodily harm in the mind of the latter. Chris had no knowledge of the incident with Karen. Thus the trial court's initial statement telling the jury that the evidence was being admitted for that purpose was erroneous.

Subsequently, as noted, the jury was simply told that they could consider the evidence of the incident with Karen as tending to show that defendant had a common plan or scheme or unique method of operation. True, the CALJIC No. 2.50 has that purpose set out as part of a list of several purposes for which evidence of other offenses may be used.[3] "Identity of the perpetrator" and "intent" have separate places in that list, but the trial court deleted from the instruction everything except common plan, scheme and method of operation. Hence, the jury was simply told, in effect, that proof of a common plan, scheme and method of operation was an independent fact to be used in determining defendant's guilt.

In considering the admissibility and use of evidence that defendant has committed other uncharged offenses the fundamental and threshold consideration is relevancy, i.e., does the evidence tend to prove or disprove a material issue in the case. (*People* v. *Peete, supra,* 28 Cal.2d 306; Witkin, Cal. Evidence (2d ed.) p. 306.) If the evidence does nothing more than prove the criminal character or propensities of the defendant it is excluded. The underlying reason for such exclusion has been variously viewed as a lack of relevancy on the one hand or a lack of probative value sufficient to outweigh its prejudicial effect on the other. (*People* v. *Schader,* 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841].)

The relevancy and concomitant admissibility of evidence of other offenses has frequently been found to rest on proof of common scheme or plan or a uniqueness of defendant's modus operandi because proof that defendant committed an offense or offenses in a manner bearing a unique similarity to the charged offense, tends to establish that he is the one who committed the charged offense. (*People* v. *Cramer,* 67 Cal.2d 126, 130 [60 Cal.Rptr. 230, 429 P.2d 582].)

This rule of admissibility, i.e., modus operandi, has traditionally been applied in cases where identity of the perpetrator was in issue. (*People* v. *Lisenba,* 14 Cal.2d 403 [94 P.2d 569]; Witkin, Cal. Evidence (2d ed.) pp. 306-308.) In those cases, modus operandi was held to be relevant to prove identity and was not independently relevant. (*People* v. *Baskett,* 237 Cal.App.2d 712 [47 Cal.Rptr. 274].)

In *People* v. *Ing,* 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590], the Supreme Court had before it a case of a doctor charged with raping a

---

[3]Here the court used the 1970 version of CALJIC No. 2.50. That instruction was revised in 1977 but the revision did not change the language with which we are here concerned.

female patient by administering an anesthetic or intoxicating narcotic in violation of then Penal Code section 261, subdivision 4. The court there approved the admission of testimony of three other former patients to whom the doctor had administered drugs and then accomplished an act of sexual intercourse.

It was there held that the evidence of the other offenses was relevant to show that defendant had a common plan[4] to commit rape. In that case, however, there was an independent basis of relevancy in showing such a plan or scheme. The evidence tended to disprove any contention that the administration of the drug was a part of legitimate medical treatment. It also showed that the drug was of such a character as to render the victim defenseless.

*Ing* was followed by a Court of Appeal decision, *People* v. *Covert,* 249 Cal.App.2d 81 [57 Cal.Rptr. 220]—a case involving incest committed by defendant with his daughter. The prosecution had produced evidence that defendant also had intercourse with another daughter under circumstances similar to those in the charged offense.

The *Covert* court, we think mistakenly, viewed the decision in *Ing, supra,* as standing for the proposition that common plan and scheme was itself an independent relevant fact. However, as was recently pointed out by Division Five of this court in *People* v. *Kazee,* 47 Cal.App.3d 593 [121 Cal.Rptr. 221]—another case of father-daughter incest—*Covert* simply promulgated the rule that " . . . the rationale for admissibility of evidence of sexual misconduct with others, in cases where there is no issue as to identity, absence of accident, and so forth, is simply corroboration of the complaining witness." (P. 596.)

*People* v. *Kelley,* 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947], a Supreme Court decision filed only a few days after *Covert* and containing no reference thereto, stated generally the principle that the usual motive, intent and other exceptions to the exclusionary rule were applicable to sex cases. In a footnote, the *Kelley* court disapproved, as too restrictive, language in *People* v. *Baskett, supra,* 237 Cal.App.2d 712, that the "common plan exception" in said cases was limited to identity.

*Kelley* was followed by *People* v. *Cramer, supra,* 67 Cal.2d 126, in which the court held, that in a prosecution for violating Penal Code section 288 committed by defendant orally copulating a 13-year-old boy,

---

[4]In the context of the *Ing* case the word "plan" could be equated with intent.

evidence of similar conduct with another 15-year-old boy was admissible in the prosecution's case.

The court in *Cramer* used the following language at page 130: ". . . as the matter is sometimes stated, the offenses offered to prove pattern, scheme, or plan are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they warrant the inference that if the defendant committed the other acts he committed the act charged." This language is that of the earlier "identity" cases and cannot be read, as *Covert*, that plan, scheme or modus operandi is an independent relevant fact.

The use of the "common plan" nomenclature in *Ing, Kelley,* and *Cramer,* was probably unfortunate because, in *People* v. *Stanley,* 67 Cal.2d 812 [63 Cal.Rptr. 825, 433 P.2d 913],—the court's latest expression in the area of child molestation cases—there was a return to the basic probative value versus prejudice test and a rejection of rigid tests of admission and exclusion. In that opinion there is no reference to "common plan" or "modus operandi."

In *Stanley,* we find the following at page 816: "In cases involving sex crimes, it has been held that evidence of other not too remote sex offenses with the prosecuting witness is admissible to show a *lewd disposition* or the *intent of defendant* towards the prosecuting witness," and further, at pages 818-819: "On the issue of probative value, materiality and *necessity* are important. The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference *to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution's case,* and is not merely cumulative." (Italics added.)

Our reading of *Stanley* leads us to the conclusion, as pointed out in *People* v. *Kazee, supra,* 47 Cal.App.3d 593, that *Ing, Covert, Kelley* and their progeny, simply and frankly stand for the proposition that in certain limited necessitous circumstances in sex cases, the *disposition* of the defendant to commit a particular type of sex offense, may be relevant in corroborating the victim on a material issue. Common scheme, plan, design, or method of operation does not have an independent relevancy of its own.

To instruct a jury, as in the case before us, that proof of a common plan, scheme, or method of operation of itself can without

limitation be considered on the ultimate question of guilt or innocence is tantamount to telling a jury that defendant's character or criminal propensities can be so used. That, of course, is not the law. (*People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7]; *People* v. *Musumeci,* 133 Cal.App.2d 354 [284 P.2d 168]; *People* v. *Westek,* 31 Cal.2d 469 [190 P.2d 9].) In the instant case the evidence of the prior offense was irrelevant on the issues for which it was purportedly admitted. (See *People* v. *Stanley, supra,* 67 Cal.2d 812.)

As to case No. A 127654, we express no opinion on whether defendant's conduct in the absence of a conviction would justify the revocation of probation and imposition of sentence. On reconsideration the trial court may well find that it does. Since it appears, however, that the trial judge's decision in that regard was based on the fact of conviction in case No. A 134319, we reverse the judgment and remand the case to the trial court for reconsideration.

In view of our disposition of this matter we deem it unnecessary to discuss defendant's other contentions.

The judgment in case No. A 134319 is reversed. The judgment in case No. A 127654 is reversed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied August 5, 1977, and respondent's petition for a hearing by the Supreme Court was denied September 15, 1977. Richardson, J., was of the opinion that the petition should be granted.