[Crim. No. AO16656. First Dist., Div. Three. June 13, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RAFAEL SALAZAR, Defendant and Appellant.

## Counsel

Rommel Bondoc for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Herbert F. Wilkinson and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**FEINBERG, J.**—Rafael Salazar appeals from a judgment entered on a jury verdict finding him guilty of two counts each of assault by means of force likely to produce great bodily injury (Pen. Code, § 245), assault with intent to commit rape (Pen. Code, § 220), and false imprisonment (Pen. Code, § 236), and one count of rape (Pen. Code, § 261, subd. (2)). He contends that: (1) the trial court erred by failing to instruct that resistance by the victim was an element of rape; (2) evidence of prior offenses was erroneously held to be admissible; (3) the trial court erred in its evaluation of the mitigating and aggravating circumstances in the sentence imposed.

I

Viewing the record in the light most favorable to the judgment and verdict, the following pertinent facts appear:

*Anny S.*

Anny S. is a member of Mumm's, a private club and restaurant on Powell and Bay in San Francisco. Sometime before April 18, 1981, Anny S. met Salazar at Mumm's through a mutual friend named Bruce. After Mumm's, the three went to Oz, a discotheque at the St. Francis. Afterwards, Anny S. and Bruce returned to Anny S.'s house and Salazar returned to his own home.

Salazar and Anny S. met again at Mumm's on April 18, 1981. They conversed, drinking wine and talking at length. When Mumm's closed at 2

a.m., they decided to continue the conversation at Anny S.'s apartment. They bought a small bottle of wine at a nearby French restaurant and drove to Anny S.'s apartment in separate vehicles. Salazar parked outside and entered Anny S.'s car; she drove into the apartment house garage and escorted Salazar to her apartment on the sixth floor. Anny S. told Salazar that she was tired, and Salazar agreed to leave at Anny S.'s request.

Inside the apartment, Salazar sat down on the sofa and Anny S. went into the bedroom to remove our her outer garments and change into a full-length robe. Anny S. then returned to the living room, sat on the floor across a table from Salazar, and poured wine. After about 10 minutes of talking and sipping wine, Salazar moved next to Anny S. and tried to kiss her. Anny S. pushed Salazar away and told him to leave. Salazar backed Anny S. toward a bed that was against a wall. Salazar struck Anny S. in the face with his fist and tried to remove her robe. In shock, Anny S. asked Salazar what he was doing; Salazar told her that he was an expert in karate and she had better be quiet and do as she was told.

Salazar pushed Anny S. onto the bed in the living room, removed her robe and underwear, and pushed down his pants. He pinned her to the bed by holding her at the biceps and tried unsuccessfully to make penetration. When Anny S. asked why he was attacking her, Salazar said that he was a "sadomasochist" and would bite her breasts until they bled if she tried to escape.

Anny S. resisted Salazar at least four times, stopping only when she became tired and feared that the struggle would excite Salazar sexually. On one occasion, Anny S. was able to leave the bed, but Salazar caught her and forced her back onto the bed. He tried to kick her in the face, but she turned toward the wall, thereby sustaining a blow on the back of her head. Again, Salazar unsuccessfully tried to achieve penetration. Finally, Salazar got up from the bed and Anny S. tried to run to reach a security call button in the hallway. Salazar pushed her away from the button, causing her to cut her head on the edge of a picture hanging from the wall. Anny S. began to bleed and this scared Salazar.

Salazar dragged Anny S. back into the living room and began to dress. Anny S. picked up her robe and ran out into the hall. Fearing that Salazar would catch her if she waited for the elevator, Anny S. descended the stairs to the third floor where two friends maintained an apartment. Anny S.'s friends were not at home, but a woman from the Philippines was staying in the apartment. The woman did not want to open the door for Anny S, who was now dripping blood from the cut on her head. Anny S. returned to her own apartment, from which Salazar had fled. Anny S. tried to telephone

her friends, but the woman in the apartment again told her they were not there. Anny S. washed her face and put an antibiotic on the cuts on her hairline and lip.

The following day Anny S. found a tan sock and beige shoe beneath the bed in the living room. She talked to a friend about the incident, but decided not to report the attack because she had seen a movie entitled "A Case of Rape," and feared abuse by the police.

Three days later, Anny S. changed her mind and reported the matter to the police. Officer Daniel Dougherty, the officer to whom she made the report, testified that she had bruises on her eye and arms and a cut on her scalp. Anny S. gave the shoe and sock to the officer.

*Patricia M.*

In June of 1981, Patricia M. was walking to the dentist at Embarcadero Center when Salazar stopped his car in traffic, introduced himself, asked her name, and offered her a ride. Patricia M. told Salazar that she was going to the dentist and did not need a ride. Later that day, Patricia M. passed by a bar called the Dartmouth Social Club on her way to a dinner engagement. Salazar came out of the bar, again introduced himself, and asked her to dinner. Patricia M. declined, but gave him her name and telephone number at work.

Salazar took Patricia M. to lunch and seemed "very funny, very nice." Salazar called Patricia M. at her office several times after their lunch date, but she was busy and could not go out. Finally, Salazar took her to dinner at Ciao and then to the Stone, a club in North Beach, and to a club in the Transamerica Building. Salazar was pleasant and took Patricia M. to her home without incident.

On August 13, 1981, Salazar and Patricia M. went on their third date.[1] They went to dinner at the North Beach Restaurant and then to Mumm's. Patricia M. testified that she drank wine with dinner and had a champagne cocktail at Mumm's, but was not under the influence of those beverages. Patricia M. accepted Salazar's invitation to go to his apartment because she was interested in moving to a new apartment and because she wanted to see Salazar's television set which had an attachment for his telephone. Salazar drove Patricia M. to his apartment on Jackson Street and escorted her inside. Immediately after shutting the door to his apartment, Salazar rushed

---

[1] Date rape, often called acquaintance rape, is an issue that has emerged recently as a widespread phenomenon. Because this crime is underreported, accurate statistics are scarce.

toward Patricia M., tearing off her skirt, blazer and T-shirt. He pushed her toward the bedroom, advising her not to scream because no one would hear her. When she did scream, he seemed surprised and covered her mouth with his hands.

Salazar removed the remainder of Patricia M.'s clothing, pushed her onto the bed, undressed himself, and had forcible sexual intercourse with her. When the act was completed, Patricia M. got up from the bed and tried to run to the bathroom to escape. Before she could shut the bathroom door, Salazar caught her and pulled her back to the bed. Patricia M. broke free and ran toward the living room, but Salazar again caught her and pushed her onto the couch. Finally, Patricia M. noticed that when she struggled, Salazar got more excited; she "played dead" and Salazar was unable to maintain an erection. Salazar became upset. He got up and threw Patricia M.'s clothes at her. He kept asking her to stay.

Salazar and Patricia M. both dressed, left the apartment and took the elevator to the ground floor. Once outside, Salazar went toward his car as if to give Patricia M. a ride home. Patricia M. flagged down a car, believing that it was a taxi cab. In fact, it was a police car. The policeman asked her if she'd had a fight with her boyfriend. She did not tell him of the rape, but asked him to drive her home, which he did. Patricia M. testified that she did not tell the officer of the rape because her sister had been hassled by the police in New York after having been raped.

Patricia M. entered her apartment and telephoned her boyfriend, Herbert B. Because he was not at home, she left a message on his answering machine. Herbert B. listened to the tape when he arrived home. He heard crying and sobbings and what sounded like the words, "Help me." Herbert B. arrived at Patricia M.'s residence at about 4:45 a.m. He found her huddled on the floor in fetal position, crying. She told him that she had been raped.

Patricia M. did not go to work for several days, and could not function adequately when she did return. About a week after the incident, at the urging of Herbert B., Patricia M. contacted a Lt. Simonton in the sex crime detail of the police department but gave no statement. Patricia M. finally described the details of the incident to Inspector Rita Grove on August 21, 1981.

Officer Timothy Mayer testified that he encountered Patricia M. on Jackson Street on August 13, 1981, at about 3:30 a.m. Patricia M. flagged down his patrol car and asked for a ride home. Mayer noticed that she was wearing a ripped dress. She told him that she had had a fight and did not want to talk about it. Mayer drove her to her apartment on Pierce Street.

II

## THE RESISTANCE REQUIREMENT

■ Appellant contends that the trial court erred by failing to instruct that resistance by the victim is an element of rape. Appellant correctly points out that the rape statute (Pen. Code, § 261, subd. 2) was amended effective January 1, 1981, to delete the former references to "resistance." (*Compare* Stats. 1979, ch. 994, § 1, p. 3383, *with* Stats. 1980, ch. 587, § 1, p. 1595.)[2] Appellant argues, however, that despite the change in the language of the statute, the Legislature did not intend to delete the requirement, reflected in the decisional law, that the victim resist in such a way as to manifest refusal to consent to the act. Because appellant relies on authorities decided before the effective date of the 1980 amendment, we cannot agree with his interpretation of legislative intent.

The record indicates that the trial court defined rape in conformance with the language of the 1980 amendment (Pen. Code, § 261, subd. 2) and CALJIC No. 10.00 (1982 Rev.).[3] The amended statute, so far as pertinent, defines rape as "an act of sexual intercourse, accomplished with a person not the spouse of the perpetrator, . . . [w]here it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another." There is no longer any reference to "resistance."

■ An intention to change the law or the meaning of a statute will generally be inferred or presumed from a material change in the statutory lan-

---

[2] The prior version of Penal Code section 261, subdivision 2 (Stats. 1979, ch. 994, § 1, p. 3383) provided: "Rape is an act of sexual intercourse, accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . (2) Where a person resists, but the person's *resistance* is overcome by force or violence." (Italics added.)

In 1980, subdivision 2 was amended to provide: "Where it is accomplished against a person's will by means *of force or fear of immediate and* unlawful *bodily injury* on the person of another." (Stats. 1980, ch. 587, § 1, p. 1595.) (Italics added.)

[3] The trial court's instruction defined the crime of rape as follows:

1. "The crime of rape as charged against the defendant in this case is an act of sexual intercourse with a person who is not the spouse of the perpetrator accomplished against the will of such person by *means of force or threat.* It is accomplished either—well, firstly, it is accomplished *against the will* either by means of force or by *means of fear of immediate and unlawful bodily injury* to such person.

"Now, in order to prove the commission of the crime of rape, *each of the following elements must be proved*:

"1. That the person *engaged in an act of intercourse* with a person,

"2. That such *person was not the spouse* of the perpetrator,

"3. That the *act of intercourse was against the will* of such other person, and

"4. That the *act was accomplished by means* of *force* or violence *or* the act *was accomplished by means of fear of immediate and unlawful bodily injury* to such person." (Italics added.)

guage. Such an intent is inferred when the existing law is amended by deletion of an express provision of the previous statute and the substitution of an alternative provision. (*People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1]; 58 Cal.Jur.3d, Statutes, § 50 (1980) pp. 384-386.) ▆▆ In the instant case, the presumption of intent to change is supported by legislative history. The legislative analyst concluded that the amendment to Penal Code section 261, subdivision 2 "would delete the provisions relative to force, violence or threats *and the element of resistance* in connection therewith and provide for rape accomplished against the will by force or fear of immediate and unlawful bodily injury." (Leg. Counsel's Dig. of Assem. Bill No. 2899, 4 Stats. 1980 (Reg. Sess.) Summary Dig., p. 158, italics added.)

In eliminating the resistance requirement, the 1980 amendment "alleviate[d] the evidentiary difficulties that impeded rape convictions under prior law . . . when there was little or no evidence outside the victim's own testimony to show that the victim resisted the attack and that the attack was overcome by the perpetrator of the rape." (*Review of Selected 1980 California Legislation, Crimes* (1980) 12 Pacific L.J. 321.)

Under the prior law, a victim's conduct had to be measured against the degree of force manifested. (*People* v. *Hunt* (1977) 72 Cal.App.3d 190, 194 [139 Cal.Rptr. 675].) As the People note, "[if] the victim's resistance was deemed inadequate, perhaps by reason of a lack of corroborative evidence (i.e., no cuts or bruises), the attacker might well have been acquitted. By shifting the focus from the quality of physical resistance to the overbearing of the victim's will, the Legislature reaffirmed its earlier value choice that a woman could be outraged although not physically beaten. Pen. Code § 263." With the elimination of the resistance requirement, it is no longer necessary for a rape victim to develop corroborative evidence by resisting and thereby precipitate further physical violence.

Appellant notes that the resistance requirement was retained in Penal Code section 261, subdivision (3) which states that rape occurs when a person "is prevented from resisting by any intoxicating, narcotic, or anesthetic substance, . . ." Appellant finds it inconceivable that the Legislature would eliminate the resistance requirement in force cases while retaining it in drug and alcohol cases. We agree with the People that "[t]he two provisions are easily reconciled. . . . To instruct that a defendant is guilty of rape when the victim's will was overcome with intoxicants is to invite an irrelevant inquiry regarding the voluntariness of the victim's ingestion." A lay jury might conclude that a person who voluntarily ingests a substance has not submitted to sexual intercourse against her will. It is less confusing

to instruct a jury that rape occurs when the person is prevented from resisting by alcohol or drugs.

We can only conclude that the Legislature clearly intended to eliminate the resistance requirement in force cases by the 1980 amendment of Penal Code section 261, subdivision (2). The trial court's instructions were correct.

## III

### EVIDENCE OF PRIOR OFFENSES

Appellant next contends that the trial court erred by ruling that if he testified, evidence of his prior misconduct would be admissible. Appellant asserts that because he did not testify, the jury was deprived of his version of the facts.

At the close of his case, the prosecutor made an offer of proof regarding prior similar acts committed by appellant. The prosecutor stated that the necessary witnesses were in Connecticut and Santa Monica, but that he would seek their return to San Francisco, and would call them in rebuttal if appellant chose to take the stand and deny commission of the prior acts. The court stated that because it had ruled late on the question of admissibility, it would not require the evidence of prior acts to be presented in the case-in-chief but would allow the evidence on cross-examination or on rebuttal. At that point, appellant announced that he would not testify, but would rest his case.

Appellant asserts that the prior acts were inadmissible and that he decided not to testify in order to avoid impeachment with the evidence. Appellant relies on *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74] and *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19] to argue that the error was prejudicial per se, and requires reversal.

To address the merits of appellant's contention, we must consider the evidence of prior acts as presented in the prosecutor's offer of proof which stated that on four occasions between 1973 and 1980, appellant casually socialized with a young woman, returned her to his (or her) residence, forcibly ripped off her clothing, threatened and beat her, and finally raped her. The court ruled that evidence of four instances might lead to cumulative evidence and that, to be admissible, each rape had to have characteristics of "a sadomasochistic problem, to put a tag on it." The prosecutor chose to present evidence of two of the rapes, which occurred in 1973 and 1975.

The facts of these two incidents, set forth by the offer of proof, are as follows:

"On the evening of May 4, 1973, Hennie V. went on a blind date with the defendant out to dinner and dancing. Alcohol was consumed by both. They went to the defendant's residence late that night, where the defendant made sexual advances toward Ms. V. He kissed her face, neck, and breasts. He then forcibly removed her clothing and disrobed himself. He told her to shut up when she screamed, to which she complied, in fear of injury. The defendant then raped her.

"On the evening of July 4, 1975, Claudia W., a twenty-two (22) year old white woman, met the defendant at a restaurant in Sausalito. She was in the company of two women, and he was with a man. One of her friends was acquainted with the defendant's companion. All five persons had a drink in San Francisco, after which the defendant drove the victim to her friends' car, then drove her to his residence against her will. The defendant forced her inside, locked the door, and then insisted she consume more alcohol. He made sexual advances, which she resisted. The defendant tore off the victim's dress, jostled her roughly, and threatened her. He disrobed himself, threw her on the bed, and kissed and fondled her breasts. Unable to achieve an erection at first, the defendant forced her to the floor, then raped her. The victim escaped and was pursued by the defendant. During the chase he grabbed her by the neck."

As appellant points out, when the threat of the admission of priors effectively prevents a defendant from telling his story to the jury, courts must consider the admissibility of the priors. (*People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Spearman, supra,* 25 Cal.3d 107; *People* v. *Fries, supra,* 24 Cal.3d 222.)

Evidence Code section 1101 provides in pertinent part: "(a) [E]vidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, *or evidence of specific instances of conduct*) is inadmissible when offered to prove his conduct on a specific occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." (Italics added.)

Our Supreme Court has been consistently rigorous in preventing the introduction of other crimes for the purpose of showing that the accused committed the offense with which he is charged. (See *People* v. *Thompson*

(1980) 27 Cal.3d 303, 316 [165 Cal.Rptr. 289, 611 P.2d 883].) ■ "Where the proffered evidence is that of other crimes it 'should be scrutinized with great care, . . . in light of its inherently prejudicial effect, and should be received only when its connection with the crime charged is clearly perceived.'" (*People* v. *Enos* (1973) 34 Cal.App.3d 25, 34 [109 Cal.Rptr. 876]; see also *People* v. *Haston* (1968) 69 Cal.2d 233, 234-235 [70 Cal.Rptr. 419, 444 P.2d 91].)

■ To be admissible under section 1101, subdivision (b), evidence of prior offenses: (1) must be offered to prove a *material* fact; (2) must have a *tendency* to prove or disprove the material fact; and (3) the proffered evidence must survive scrutiny under several exclusionary rules. (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315; *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841].) ■ In sex offense cases, our Supreme Court has set forth a less stringent test for the admission of evidence of uncharged offenses where the evidence is offered to show a "common design or plan." *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433] holds that evidence of uncharged sex offenses is admissible to show a common scheme, ". . . where the prior offenses (1) are not too remote in time, (2) are similar to the offense charged, and (3) are committed upon persons similar to the prosecuting witness. [Citations.]" (*Id.,* at p. 465.)

■ To satisfy the first prong of the *Thompson* test, the requirement of materiality, "the fact sought to be proved may either be an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be presumed or inferred.'" And, the ultimate fact to be proved must be "actually in dispute." (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315.) In the instant case, the evidence of prior offenses was offered to prove the issues of appellant's intent and the victims' consent and therefore was material to the prosecution's case. By admitting the incident with Patricia M. but relying on the defense of consent, appellant put his intent in issue. Because both charged counts involved young women who had socialized with appellant, had gone to bars with him, and had gone to his residence (or had invited him to theirs) late in the evening after alcohol had been consumed, the prosecution was required to put to rest any claim of consent. To prove lack of consent as well as intent, it was necessary for the prosecution to prove that appellant had raped other women under similar circumstances.

■ In considering the second prong of *Thompson,* the question of relevancy, the court "'must examine the precise elements of similarity between the [charged and uncharged] offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link in the chain of inference

between the former and the latter is reasonably strong.'" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 316.) ■ In the instant case, an examination of the common marks connecting the prior crimes with the charged offenses reveals definite similarities: (1) in each case appellant socialized with the victims; (2) he took each to places where alcohol was consumed; (3) he had only a casual acquaintance with each victim; (4) each attack occurred late in the evening or early in the morning; (5) each incident took place either at the victim's residence or the appellant's; (6) each victim was young; (7) each was threatened and physically abused to excite appellant, who was unable to sustain an erection unless the victim offered physical resistance; (8) in each incident, appellant forcibly removed the victim's clothing, usually tearing it off, and disrobed himself; (9) in each of the incidents, appellant made references to and/or fondled the victim's breasts. Of these nine elements of similarity, the most "highly distinctive common marks" are the tearing off of the victim's clothing and the violence which appellant requires in order to sustain an erection. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Rodriguez* (1977) 68 Cal.App.3d 874, 885 [137 Cal.Rptr. 594].)

In addition to satisfying prong two of the *Thompson* test, the common marks outlined above satisfy the *Thomas* test for uncharged offenses which are used as evidence to show a "common design or plan." (*People* v. *Thomas, supra,* 20 Cal.3d at p. 464.) In proving a "common design or plan," the prosecution would have established that appellant intended to have sexual congress by force with the victims involved.

Under the *Thomas* test, the prior offenses were clearly admissible. The 1973 and 1975 incidents were not remote in time. Appellant's activities since 1973 suggested a pattern of criminality rather than an isolated instance. (See *People* v. *Wilson* (1975) 50 Cal.App.3d 811, 818-819 [123 Cal.Rptr. 663].) The prior offenses were also clearly similar to the charged offenses. As detailed above, there were at least nine elements of similarity between the charged and uncharged offenses. *People* v. *Pendleton* (1979) 25 Cal.3d 371 [158 Cal.Rptr. 343, 599 P.2d 649] indicates this is sufficient to satisfy the *Thomas* test. Finally, the victims in both the charged and uncharged offenses were similarly situated. Each was a young woman who socialized with the appellant at places where alcohol was consumed.

To satisfy prong (3) of the *Thompson* test, the evidence of uncharged offenses must survive scrutiny under two exclusionary rules. ■ First, evidence of uncharged offenses may not be admitted where it is "cumulative" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 318); second, the evidence also may be excluded under Evidence Code section 352 when its prejudicial effect outweighs its probative value. (*Ibid.*)

In the instant case, the central issues were appellant's intent and the complaining witnesses' consent. The evidence of uncharged offenses was not "merely cumulative with respect to other evidence which the People may use to prove the same issue." (*People* v. *Schader, supra,* 71 Cal.2d at p. 775.) Since there was no other evidence of appellant's intent, the evidence of the uncharged offenses could not have been excluded under a rule of necessity. Thus, the evidence of uncharged offenses had "substantial probative value." (*People* v. *Thompson, supra,* 27 Cal.3d at p. 318.) The uncharged offenses were committed in a very similar manner to the charged offenses. Evidence of appellant's unique modus operandi tended to corroborate Anny S.'s and Patricia M.'s testimony that they were raped.

■ We conclude that the evidence of uncharged offenses was admissible. (However, as the record indicates that the evidence of the uncharged offenses was not admitted, appellant was not improperly deprived of his right to give the jury his version of the facts.)

## IV

### SENTENCING

Finally, appellant argues that the trial court erred in imposing the upper base term of eight years on the rape conviction. He disputes the court's evaluation of the aggravating and mitigating factors.

The record indicates that the court initially sentenced appellant to the midterm of four years on count II (Pen. Code, § 220, Anny S.) and a full consecutive term of six years on count V (Pen. Code, § 261, subd. (2), Patricia M.), for a total of ten years. Persuaded by appellant that Penal Code section 667.5 does not permit full consecutive sentencing where there has been only one conviction within its purview, the trial court vacated the initial sentence. The court then sentenced appellant to the aggravated term of eight years on count V and ran everything else concurrent.

In imposing this sentence, the court relied on the following aggravating factors: (1) vulnerability of the victims; (2) sophistication and planning of the crimes and premeditation; (3) multiple victims and multiple offenses; (4) increasing seriousness of the crimes; and (5) pattern of violent conduct. The court further found that appellant did not have an insignificant record of criminal conduct and that there was nothing before it except the "bald assertion", of the probation officer, that appellant's prior performance on probation was good.

■ Appellant argues that the court erred in relying on several aggravating factors. Appellant contends that because the victims were in private

residences, they were no more vulnerable than other rape victims. Appellant also argues that there was no evidence of a premeditated rape and that the crimes were not of increasing seriousness.

We cannot agree. First, a person in a private residence, especially that of her attacker, is more vulnerable than a woman fending off a rapist in a car on a dark street or in a public restroom. (See *People* v. *Wilson* (1982) 135 Cal.App.3d 343, 358 [185 Cal.Rptr. 498]; *People* v. *Karsai* (1982) 131 Cal.App.3d 224 [182 Cal.Rptr. 406].) Second, there was evidence of premeditation rather than seduction. Appellant ripped off Patricia M.'s clothing as soon as she entered the apartment. He made no effort to seduce her. Finally, appellant's conviction of assault in 1975, together with the convictions in the present case, show a pattern of violent and increasingly serious behavior.

Appellant also contends that the court erred in rejecting the mitigating factors of his insignificant prior record (Cal. Rules of Court, rule 423(b)(1)) and good prior performance on probation (Cal. Rules of Court, rule 423(b)(6)). ▮ A trial court may minimize or even entirely disregard mitigating factors without stating its reasons. (See *People* v. *Regaldo* (1980) 108 Cal.App.3d 531, 538-539 [166 Cal.Rptr. 614]; *People* v. *Davis* (1980) 103 Cal.App.3d 270, 281 [163 Cal.Rptr. 22].)

Because the aggravating factors far outweighed those in mitigation, the court did not abuse its discretion when it imposed the upper base term sentence of eight years.

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied July 13, 1983, and appellant's petition for a hearing by the Supreme Court was denied August 10, 1983.