Filed 4/2/14  P. v. Buccat CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL CASTRO BUCCAT,<br><br>    Defendant and Appellant. | H038875<br>(Santa Clara County<br>Super. Ct. No. CC949364) |

A jury found Daniel Buccat (appellant) guilty of one count of oral copulation by force or fear (Pen. Code, § 288a, subd. (c)(2), count one), and one count of false imprisonment by violence (§§ 236, 237, count two).[1]  In addition, the jury found appellant not guilty of inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a), count three), but guilty of the lesser included offense of battery on a fellow parent (§ 242/243).  With respect to count one, the jury found true the allegation that appellant personally used a firearm within the meaning of section 12022.53, subdivision (a), and with respect to count two that appellant personally used a firearm within the meaning of section 12022.5.

On September 28, 2012, the court sentenced appellant to a total term of 14 years eight months in state prison.  On count one, the court imposed the low term of three years

---

[1]    All unspecified section references are to the Penal Code.

plus 10 years for the personal use of a firearm enhancement. On count two, the court imposed a consecutive term of eight months (one third the mid-term), plus one year for the personal use of a firearm enhancement (one third the low term). As to count three, the court denied probation and sentenced appellant to six months in county jail concurrent to the term for counts one and two, which the court deemed served.

Appellant filed a timely notice of appeal.

On appeal, appellant contends that the prosecutor committed misconduct by misstating the presumption of innocence and the court erred in admitting the victim's prior consistent statements, both of which violated his right to due process and a fair trial. Further, the sentence on count two should have been stayed pursuant to section 654 because he harbored a single intent and objective. Finally, he contends that in the event section 654 does not bar the imposition of the sentence on count two, the trial court abused its discretion in imposing a consecutive sentence. For reasons that follow, we affirm the judgment.

*Evidence Adduced at Trial*

In July 2009, appellant and Jane Doe[2] had been married for over 10 years; they had two young children. Although they lived in the same house with the children, they were separated and had stopped sleeping together. Jane's mother, appellant's sister-in-law Bobbie Buccat and her daughter, and an adult niece also lived in the house. Jane slept in a room with her children and her mother. However, she kept some personal items in the master bedroom where appellant slept. Jane wanted a divorce and planned to move out of the house around July 11, 2009.

At approximately midnight on July 11, 2009, Jane came home. Appellant was sitting in the living room watching television and drinking beer. Before going to sleep, Jane went to the master bedroom to get a change of clothes. Jane heard appellant coming

---

[2] We refer to the victim by this name to protect her anonymity.

2

down the hallway to the bedroom; appellant was walking quickly. Appellant walked into the bedroom, shut and locked the door, turned on the television and turned up the sound; he turned off the lights. Jane saw appellant take something from his backpack. Appellant used his body weight to push and then pin Jane on the bed. Appellant put a black, cold, metal gun against Jane's cheek. Appellant told Jane " 'This gun is not for you. This gun is for me. It's not for Dylan. It's not for Mom. It's not for Bobby. It's for me. I'm going to let you watch me kill myself. You did this to me.' " Appellant threatened Jane that if she made any noise and someone came through the door, he would shoot them. Appellant said that he did not care who it was, even if it was the police. Jane testified that she was afraid for her life, the lives of her family members and for appellant's life.

Appellant began to ask Jane a lot of questions, which Jane tried to answer. At one point, appellant struck Jane on the back of her right hand with the back of the gun and again on the top of her head. Jane felt blood trickle down her cheek. She told appellant that she was bleeding; appellant said that he did not care and he threw a t-shirt over her head. Jane told appellant that her head hurt. Appellant turned on the light and told her that it was just a small cut because he had hit her with the back of the gun. Jane told appellant that she was thirsty and appellant got her some water from the master bathroom. Jane tried to get up, but appellant waived the gun at her and told her " '[g]et back.' " When appellant returned to the bed he told Jane that he wanted to "come" before he died. Appellant started to take off Jane's clothes and said he wanted to have intercourse with her. Jane had just had cervical surgery; she told appellant she was bleeding heavily. Appellant undressed and took off all Jane's clothes except for her underwear. Appellant kissed Jane on the lips; she turned away. Appellant kissed her neck, breasts and thighs. When appellant pulled down Jane's underwear and saw she was bleeding he turned her onto her stomach and kissed her back, buttocks and anus. By this time Jane was crying; she asked appellant to stop.

Appellant moved to Jane's right side and turned her body towards him, placed his penis on her cheek, held the back of Jane's head and told her " 'suck it.' " Jane asked appellant to stop but he would not listen. Jane testified that she did not want to die and so she complied. Jane said that she did not know exactly where the gun was at this time, but she thought that it was close by. After a few minutes, without ejaculating, appellant pulled his erect penis out of Jane's mouth and told her to put on her clothes. Appellant told Jane to leave the room because he wanted to shoot himself. Jane testified she never felt free to leave the room for the first hour she was there. When appellant told her to leave she felt free to go, but was afraid of what might happen; that is, she thought that appellant might shoot himself or her or a family member.

Eventually, Jane talked appellant into letting go of the gun. They were both exhausted by now and they fell asleep. Jane held appellant's hand so that he would not grab the gun again. The next morning, after Jane woke up she showered. When she walked into the bedroom she thought that appellant might prevent her from leaving, but he went to the kitchen for coffee. At this time, appellant was acting normal and even offered to help her move out of the house.

Bobbie Buccat[3] testified that when she saw Jane on the morning of July 11th, Jane's eyes were "puffy, like she had been crying all night long." Later, Jane started sending text messages to her; she texted that she stayed up all night with appellant because he was going to commit suicide. Jane texted that Bobbie should contact appellant's sisters and tell them that appellant had tried to commit suicide and that he had a gun. Bobbie thought that it was strange that Jane was texting her because they were in the same house. Bobbie tried to talk to Jane later, but Jane would not say anything other than what she needed to be moved. When appellant entered the room Jane would keep

---

[3] To avoid any confusion we refer to Ms. Buccat by her first name. No disrespect is intended.

quiet and change the subject. Bobbie formed the impression that Jane wanted to talk to her about something.

According to Bobbie, later that evening when appellant was not at home and Jane had returned from moving her things, they spoke and Jane told her that appellant had kept her in the bedroom, asked her questions and hit her on the head with a gun and that her head was still hurting. Bobbie told her if her head was still hurting she should go to see a doctor. Bobbie testified that Jane told her that appellant made her give him a "blow job."

Jane testified that later in the evening on the day of the incident she did not feel well and thought she might need a CT scan. She called Santa Teresa Kaiser Hospital and explained that her husband had hit her with a gun. Hospital staff called the police. Five or six police officers arrived at the house at around 11 p.m. Jane met the officers outside. Officers White and Viale conducted a recorded interview with Jane inside the house. According to Jane, she gave the officers a full account of what had happened. During the interview, appellant telephoned the house several times. The officers asked Jane to talk to appellant while Officer Viale recorded the telephone conversation. The officers told Jane to ask appellant where he was and to find out if he still had the gun; and then if there was time to ask about the alleged crime. The officers did not ask Jane specifically to ask about the forced oral copulation. A series of recordings of the telephone conversation were played for the jury. Jane asked appellant about the location of the gun; he said he had it. Jane told him he would get in trouble if he had the gun, but appellant said he did not have it with him. Eventually, appellant said that he used a metal toy gun that looked real and that it was in the backyard kitchen cabinet.

Officers searched the house for the gun. According to Officer White, they found two BB guns in the backyard kitchen drawer that had yellow tips. The guns were not collected. The officers found two .22 caliber rifles and ammunition behind the living room couch. The officers collected the bloodied t-shirt that appellant had put on Jane's head to stop the bleeding. The officers found a safe that belonged to appellant; when

5

Jane found the key for it a couple of days later she discovered a document dated July 9, 2009, that contained a list of names and how appellant wanted to distribute his property among the people on the list. Officers White and Viale searched the master bedroom, but before they were finished the cellular telephone company called to provide them with appellant's exact location.

Around 2 a.m., Officer White and four other officers went to a house on Louise Court that was owned by appellant's friend. The police stopped appellant's friend while he was walking down the street; they talked to him. A few minutes later, appellant appeared near the house. The officers shouted for appellant to get down on the ground. Appellant refused and repeatedly told the officers " '[j]ust shoot me, just shoot me.' " The officers were concerned that appellant was still armed so when appellant refused to get down on the ground Officer Sessions used his taser to try to subdue appellant. When hit by the taser in the chest, appellant flexed and stood up; he made a grunting sound. Officer White used his taser on appellant and this time appellant went down to the ground. Officers hand-cuffed appellant and put him in a patrol car.

The next day, Jane was in the kitchen with appellant's three sisters and Bobbie talking. Someone mentioned a BB gun. Jane looked around the kitchen and found a black faded metal BB gun in a cabinet. Someone pulled out the gun and someone else "put it away." Jane testified that the gun appellant used on her was "shin[i]er." Jane did not recall if she told the sisters that appellant had forced her to orally copulate him.

A few days later while Jane was looking for some documents for a realtor, Jane discovered a briefcase under the bed in the master bedroom. Inside the briefcase were headphones, a Bluetooth device and a black, shiny, handgun. Jane testified that she believed it was the gun that appellant had used to threaten and hit her. She picked up the gun and then put it back in the briefcase. Jane called the police and was instructed to take the gun to the Campbell Police Department. Sergeant Batey met Jane in the lobby of the police department and then went with her to her car; there he retrieved the briefcase.

6

Briefly Jane told the sergeant about appellant hitting her with a gun on July 11th; she told him that officers had searched for the gun and that she found it under the bed. Sergeant Batey opened the briefcase and found a telephone, a Bluetooth device and a .45-caliber semi-automatic H and K handgun. In order to make the gun safe Sergeant Batey removed the magazine from the gun. The magazine contained three bullets and the chamber was empty. At trial, Sergeant Batey admitted that by handling the gun he could have disturbed fingerprints or DNA evidence in the area he touched. Inside the police department Sergeant Batey put on gloves and inspected the gun. He thought the gun was new and had never been fired. He inspected the gun for blood, but found none. Sergeant Batey booked the gun into evidence and returned the briefcase and the remaining contents to Jane. At trial Jane identified the gun as the one appellant used to threaten and hit her.

On April 6, 2010, Jane was interviewed by Trish O'Neill, an investigator with the Santa Clara County District Attorney's Office. Jane told O'Neill what had happened including that appellant forced her to orally copulate him. At trial, O'Neill recounted what Jane had told her, which in essence matched Jane's trial testimony.

Criminalist Karla Henkel from the Santa Clara County Crime Laboratory examined the gun and cartridges from this case. The gun grip was textured and not conducive for recovering latent prints. Henkel found no usable prints or biological fluids on the gun.

The defense called several witnesses in an attempt to portray Jane as a manipulative liar. Vickie Calibozo, whose husband worked with appellant, testified that when Jane recounted what had happened Jane told her that nothing sexual happened. Appellant's sister Melva Buccat testified that Jane had said that she thought the BB gun that was found in the kitchen was the gun appellant used; and Jane said that the cut on her head might have occurred by accident.

7

Dr. John Watts Podboy, a psychiatrist in private practice, testified as an expert in forensic psychology and the interface between psychology and the law. Based on his interview with appellant on November 16, 2011, psychological tests he administered, and his interview of nine people who were long term acquaintances of appellant and Jane, Dr. Podboy concluded that appellant was suffering from a major depressive disorder. He concluded that it was possible, but highly unlikely that appellant would have been able to achieve an erection; and that appellant was very low in the category showing violent tendencies. According to Dr. Podboy, some of appellant's and Jane's friends thought that Jane was a different person privately and that she could become "psycho" when nobody was around. Others noted that she stayed out late at night and she became cool and withdrawn after she returned from Guam where she had visited friends and family.

Donna Tindall, appellant's neighbor, testified that she saw appellant on the day of the incident and he was rambling and in a state of confusion. Tindall said that after appellant was arrested, she and her husband helped Jane empty the house. Jane told Tindall about the incident and then, with a smile on her face, said " 'He's going to be in there for a long time.' "

*Discussion*

*Alleged Prosecutorial Misconduct*

*Background*

Near the end of his rebuttal argument, the prosecutor told the jury "Just one brief comment about the presumption of innocence. Okay. [¶] Now, I've already talked about what it means and the fact that you have to have an abiding conviction of the underlying truth of it. But I want to use the metaphor that I've used throughout my career about how it is that we as lawyers and you as jurors should think about it. Okay. [¶] The presumption of innocence should be thought of as a cloak or a coat. It's a privilege that we give to the defendant. Okay. He puts it on when he comes to this courtroom, and he's tried by us, and the evidence is heard by you. *And the presumption of innocence ends*

*when all the evidence has been presented and you go back and deliberate.* It is then that you use the evidence to pull back the cloak and show the guilt that is underneath. The presumption is over once you get into the deliberation room and find the defendant guilty. Okay." (Italics added.)

Defense counsel objected on the ground that the prosecutor had misstated the law. The court admonished the jury that "if anything that the attorneys say conflicts with my instructions on the law, you must abide by the instructions."

Appellant claims that the prosecutor's argument misstating the presumption of innocence violated his due process rights and his right to a fair trial.

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." [Citation.]' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1263-1264.)

With respect to the prosecutor's explanation that the *presumption of innocence ends when all the evidence has been presented and you go back and deliberate,* the prosecutor erred in describing when the presumption of innocence ends: it ends when

9

guilt is proven. It is well established that the presumption of innocence remains with the accused throughout every stage of the trial, including the jury deliberations, and it is extinguished only upon the jury's determination that guilt has been established beyond a reasonable doubt. " 'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.' [Citation.]" (*Taylor v. Kentucky* (1978) 436 U.S. 478, 483.) However, when read in context with the rest of the explanation, the prosecutor accurately informed the jury that appellant was presumed innocent and it was not unless or until they had examined all the evidence and found it sufficient to prove appellant guilty that the presumption ended. In the prosecutor's words the jury had to "use the evidence to pull back the cloak and show the guilt" and the presumption ended when they found "the defendant guilty."

The defendant in *People v. Goldberg* (1984) 161 Cal.App.3d 170 (*Goldberg*) made a claim similar to the one that appellant brings here. In that case, the prosecutor argued to the jury as follows: " 'And before this trial started, you were told there is a presumption of innocence, and that is true, but once the evidence is complete, once you've heard this case, once the case has been proven to you-and that's the stage we're at now-the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence.* Defendant Goldberg has been proven guilty by the evidence. . . .' " (*Id.* at p. 189.)

The *Goldberg* court found this did not constitute misconduct. The court reasoned that "[o]nce an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they,* as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." (*Goldberg, supra,* 161 Cal.App.3d at pp. 189-190.) The court found it significant that the trial court instructed the jury with CALJIC No. 2.90 [the predecessor to CALCRIM No. 220] and the prosecutor twice reminded the jury

10

that the government had the burden of proving guilt beyond a reasonable doubt. (*Id.* at p. 189.)

Here, the court fully instructed the jury on the presumption of innocence. At the beginning of the trial the court instructed the jury pursuant to CALCRIM No. 220 as follows: "I will now explain the presumption of innocence and the People's burden of proof. The defendant has pleaded not guilty to the charges. The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The court repeated this instruction at the end of the prosecutor's rebuttal argument. Furthermore, the court told the jurors that they "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

During his argument to the jury the prosecutor told the jurors that "the People have the burden of proof in this case." Then, before presenting his slides containing the explanation of the law as applied to this case, the prosecutor told the jurors that the judge was "going to read to you a very lengthy set of instructions. [¶] What I have on these

11

slides is a paraphrase. So if you have any doubt about what the actual elements are, or anything like that, please refer to the instruction packet that the judge will give to you that you will have in the jury deliberation room. Okay?"

Defense counsel discussed at length the beyond a reasonable doubt standard and explained to the jurors "Now, because this is a criminal case, the issue of proof is the highest in all of American jurisprudence. So the standard is that a defendant in a criminal case is presumed innocent. The People must prove the defendant guilty beyond a reasonable doubt. Okay. This is a guiding principle in your deliberation. [¶] Presumed innocent. You have to prove a defendant guilty beyond a reasonable doubt . . . ." During argument defense counsel used the phrase reasonable doubt well over 30 times, and argued that the prosecutor failed to prove appellant had committed each crime charged beyond a reasonable doubt.

"Due process . . . requires that guilt be determined only on the evidence presented at trial, not on suspicion, the defendant's status or facts outside the evidence. [Citations.] Although the presumption-of-innocence instruction has long been held to convey that concept, there is no constitutional mandate that juries be instructed specifically on the presumption of innocence in every case. (*Kentucky v. Whorton* (1979) 441 U.S. 786, 789, . . . ['failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution'].) Rather, the presumption of innocence instruction 'simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial.' [Citation.] When such an instruction is omitted or rejected [or as in this case is misstated] . . . the relevant inquiry for determining federal constitutional error is whether, in light of the totality of the circumstances, including all the instructions given to the jury, the arguments of counsel and weight of the evidence, the omission of the instruction deprived the defendant of a constitutionally fair trial. [Citations.]" (*People v. Mayo* (2006) 140 Cal.App.4th 535, 543.) Under the totality of the circumstances in this case, the misstatement regarding the

12

presumption of innocence did not deprive appellant of a constitutionally fair trial. We find no basis for reversal.

Appellant seeks to preserve this issue for federal review relying on *United States v. Perlaza* (9th Cir.2006) 439 F.3d 1149 (*Perlaza*). In *Perlaza*, the prosecutor argued to the jury, " '[The presumption of innocence], when you go back in the room right behind you, is going to vanish when you start deliberating. *And that's when the presumption of guilt is going to take over you . . . .*' " (*Id*. at p. 1169.) The Ninth Circuit ruled the prosecutor's remark constituted misconduct, and that the trial court's curative instruction failed to correct its initial ratification of the prosecutor's argument when it stated in the presence of the jury, " 'That's proper rebuttal. Go ahead. You are all right.' " (*Id.* at p. 1171, fn. 25.) *Perlaza,* which is not binding on this court, is distinguishable as not only did that prosecutor make an incorrect statement of law—" 'presumption of guilt' "—but the error was compounded by the trial court's initial ratification of the misstatement— " '[y]ou are all right' "—and the Ninth Circuit ruled the curative instruction neither set forth the prosecutor's burden of persuasion, that is, proof beyond a reasonable doubt, nor clarified that the presumption of innocence " 'goes with the jury when it deliberates.' " (*Id.* at pp. 1171–1172 & fn. 25.) Although appellant contends the prosecutor's argument in his case failed to specify explicitly that the presumption of innocence continued until jury deliberations were concluded, that concept was addressed adequately by CALCRIM No. 220, which the trial court read to the jury twice. Moreover, the prosecutor here emphasized that he bore the burden of proof beyond a reasonable doubt, and defense counsel noted repeatedly that prosecutor had failed to meet his burden. As such, the jury was not misled.

*Admission of Jane's Prior Consistent Statements*

*Background*

When defense counsel cross-examined Jane, he established that prior to testifying Jane had reviewed the police reports, recordings of her statements to law enforcement,

13

statements she made to Investigator O'Neill, the transcript of the preliminary hearing and that the prosecutor had told her that it was crucial she was consistent in her testimony. Defense counsel then questioned Jane very extensively about what she had told Officers White and Viale. Defense counsel questioned Jane about whether her hands were across her face or chest during the attack and attempted to impeach her with statements given to White and Viale, O'Neill, and at the preliminary hearing about where her hands had been during the attack and why she did not leave the room. Then, defense counsel questioned Jane about whether she told White or Viale that appellant put his penis against her cheek and had her admit that the first time she mentioned that fact was to O'Neill almost 10 months after the incident. Counsel followed up with questions about whether she told Calibozo that appellant tried to rape her, but that nothing sexual happened. Counsel tried to impeach Jane's testimony that the gun used was a real gun and a shiny gun; counsel questioned Jane about her preliminary hearing testimony where she stated that appellant might have been using the toy gun and that she was not sure which gun he used. Repeatedly, defense counsel asked Jane about the gun used and her discovery of the gun.

On redirect, the prosecutor elicited from Jane that she told the officers that appellant forced her to orally copulate him, but the officers asked no follow-up questions. Jane told the jury that she felt more comfortable talking to O'Neill and that O'Neill asked her more questions. Jane explained that the gun she found under the bed was the gun used in the incident because the BB gun had a slimmer handle.

Over defense counsel's objection,[4] the court permitted the prosecutor, through O'Neill, to introduce everything that Jane told her.

---

[4] Defense counsel argued that since his questions to Jane were pointed with respect to her prior inconsistencies, the prosecution should be permitted to rehabilitate Jane only with statements that were related to those inconsistencies. Counsel argued that statements that did not rehabilitate Jane on the areas where she was impeached were inadmissible hearsay; further, they were inadmissible under Evidence Code section 352 as they were cumulative and burdensome.

Appellant contends that the court erred when it permitted the prosecutor to introduce the entirety of Jane's statements to O'Neill. Appellant concedes that portions of Jane's statements to O'Neill were properly admitted as prior consistent statements to refute defense counsel's characterization of her testimony. He argues, however, that the entirety of her interview statement was not admissible because it was hearsay.

Evidence Code section 1236 provides, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with [her] testimony at the hearing and is offered in compliance with Section 791." In turn Evidence Code section 791 provides, "Evidence of a statement previously made by a witness that is consistent with [her] testimony at the hearing is inadmissible to support [her] credibility unless it is offered after: [¶] (a) Evidence of a statement made by [her] that is inconsistent with any part of [her] testimony at the hearing has been admitted for the purpose of attacking [her] credibility, and the statement was made before the alleged inconsistent statement . . . ."

Thus, Evidence Code section 791, subdivision (a) requires only that the prior consistent statement be "offered after" evidence of a later statement "inconsistent with any part of [her] testimony at the hearing has been admitted for the purpose of attacking [her] credibility . . . ." The statute does not require that the prior consistent statement concern the exact same fact as the prior inconsistent statement. The credibility focus of the statute and its broad reference to a statement that is inconsistent "with any part" of the witness's testimony suggests that the statute was intended to permit prior consistent statements to be admitted to support a witness's credibility generally when the witness's credibility is attacked with a prior inconsistent statement rather than merely to rebut such an attack as to a particular factual issue.

Appellant argues that since Jane's statements to O'Neill were made after her statements to both White and Viale and Calibozo, the statements to O'Neill could not be admitted under Evidence Code section 791, subdivision (a), because subdivision (a)

15

permits the introduction of a prior consistent statement only where the consistent statement was made before the inconsistent statement.  Thus, he argues, none of the statements to O'Neill used to rehabilitate the absence of statements to Viale and White or the actual statements made to Calibozo could have been admitted under this exception to the hearsay rule.

Appellant contends that the admission of Jane's statements to O'Neill bolstered Jane's credibility and gave her trial testimony a false aura of reliability in violation of his right to a fair trial and due process.  We are not persuaded by this contention.

Assuming for the purposes of argument that the trial court admitted prior statements not encompassed within Evidence Code sections 1236 (prior consistent statements), state law errors in the admission of hearsay are reviewed under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619.)  An erroneous exercise of discretion in the application of ordinary rules of evidence generally does not implicate the federal Constitution.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1403.)  "[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair."  (*People v. Partida* (2005) 37 Cal.4th 428, 436.)  " 'To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.' [Citation.]  ' "The dispositive issue is . . . whether the trial court committed an error which rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' [Citations.]" [Citation.]' [Citation.]"  (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)  Appellant has not satisfied this high constitutional standard. O'Neill's testimony was not a significant portion of the prosecution's case-in-chief; and it was far from the primary evidence of appellant's guilt.

Furthermore, in general, admission of hearsay evidence cumulative to properly admitted evidence does not prejudice a defendant.  (*People v. Riccardi* (2012) 54 Cal.4th

16

758, 829.)  To put it another way, the erroneous admission of a witness's prior statement is harmless where the evidence is cumulative, so that it is not reasonably probable the evidence affected the verdict.  (*People v. Arias* (1996) 13 Cal.4th 92, 153.)  In this case, Jane testified on direct examination to much, if not all, of the events that she related to O'Neill some 10 months after the incident.  Thus, O'Neill's testimony was cumulative to Jane's direct and redirect testimony.  Insofar as O'Neill's testimony did not materially differ from Jane's, and thus should not have been admitted, it was merely cumulative.  Hence, it is not reasonably probable that such erroneous admission affected the verdict.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1220; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

As to appellant's contention that O'Neill's testimony bolstered Jane's credibility and gave her trial testimony a false aura of reliability, we note that appellant was found not guilty of inflicting corporal injury on a spouse or cohabitant, but guilty of only the lesser included offense of battery.  Thus, the jury did not accept Jane's testimony uncritically.

In sum, we have no doubt that the jury would have reached the same result in the absence of the asserted error.

*Section 654*

As noted, on count one (the forced oral copulation) appellant was sentenced to prison for three years plus 10 years for the attached personal use of a firearm enhancement.  The court imposed a consecutive sentence on the remaining felony count of false imprisonment with its related firearm enhancement.  The court explained that the reason that it was imposing a consecutive sentence was because the "case involved two separate acts of violence.  These acts occurred over a several-hour period of time, and the defendant did have ample opportunity to reflect on his actions and the consequences of those actions."  Appellant contends that the sentence for count two must be stayed

17

pursuant to section 654 because the evidence established that his sole objective was to have sexual relations with Jane one last time before he killed himself.

"As interpreted by the courts, . . . section 654 precludes multiple punishment where several crimes are committed during an indivisible course of conduct with a single criminal objective.  Multiple punishment is permissible if the defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other.  The focus of the inquiry is the defendant's intent and objective.  [Citations.]" (*People v. Goodall* (1982) 131 Cal.App.3d 129, 147.)  The statute does not apply if a defendant had "separate, although sometimes simultaneous, objectives. . . ."  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212 (*Latimer*).)

Whether multiple convictions were part of an indivisible transaction is primarily a question of fact for the trial court.  (*People v. Coleman* (1989) 48 Cal.3d 112, 162 (*Coleman*); *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.)  We review a challenge under section 654 for substantial evidence to support the trial court's determination. (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1336–1337.)  Moreover, this deferential standard of review applies whether the trial court's findings are explicit or implicit. (*People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585.)

Applying these principles here, we conclude the trial court's implied determination that section 654 was inapplicable is supported by substantial evidence.  The offenses involved separate intents and objectives and therefore were punishable as separate crimes.  (*Coleman, supra,* 48 Cal.3d at p. 162 [in determining whether facts call for application of § 654, threshold inquiry is to determine defendant's objective and intent]; *Latimer*, *supra*, 5 Cal.4th at p. 1208 [whether a course of conduct constitutes one indivisible act or more than one act depends on defendant's criminal intent and objective].)

The false imprisonment began when appellant shut and locked the master bedroom door; his objective at this point was to confine Jane so that she would have to watch him

18

kill himself. It was not until later that appellant said that he wanted to have sexual relations with Jane. Appellant's broad characterization of his objective—"to have sexual relations with his wife a final time before he killed himself" does not describe his actions and multiple intents in sufficient detail. Virtually any two offenses can be viewed to be within a stated objective, if the objective is stated broadly enough. (See, e.g., *People v. Perez* (1979) 23 Cal.3d 545, 549, 552 [objective of sexual gratification in a case where defendant was convicted of oral copulation, sodomy, and rape is much too broad and amorphous to determine the applicability of section 654].) The fact that the false imprisonment by violence was ongoing did not prevent appellant from forming and carrying out a separate criminal objective. In contrast to *Neal v. State of California* (1960) 55 Cal.2d 11, 20 [defendant convicted of attempted murder could not be punished for arson where arson was means by which murder was attempted] and *People v. Jaquette* (1967) 253 Cal.App.2d 38, 49 [no separate punishment for kidnapping that was incidental to rape] here the false imprisonment was not simply the means by which the crime of forcible oral copulation was accomplished. Here the evidence established that appellant entertained two objectives in falsely imprisoning Jane; one, to force Jane to watch him kill himself and secondly to engage in sexual relations before he did shoot himself. Under the circumstances of this case section 654 does not apply. The court was not required to stay the sentence on count two.

*Consecutive Sentencing*

Appellant contends that in the event this court rejects his argument that section 654 applies to his sentence on count two (the false imprisonment), the trial court abused its discretion by imposing consecutive sentences. Respectfully, we disagree.

"Generally, determination of the appropriate term is within the trial court's broad discretion [citation] and must be affirmed unless there is a clear showing the sentence choice was arbitrary or irrational [citation]." (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.) "[E]xercise of that wide discretion must not be disturbed on appeal *except* on

19

a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316; accord *People v. Giminez* (1975) 14 Cal.3d 68, 72 [a court abuses its sentencing discretion whenever the court exceeds the bounds of reason, all of the circumstances being considered].)  " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)  In short, we apply the abuse of discretion standard when reviewing sentencing decisions.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

Factors relating to the decision to impose concurrent or consecutive sentences are set forth in California Rules of Court, rule 4.425.  The factors include, in part: (1) "The crimes and their objectives were predominantly independent of each other"; (2) "The crimes involved separate acts of violence or threats of violence"; and (3) "Any circumstances in aggravation or mitigation," unless the fact is used to impose an upper term, enhance defendant's sentence, or is an element of the crime.  (Cal. Rules of Court, rule 4.425.)

As noted *ante*, the court found that the crimes involved two separate acts of violence, which occurred over a period of time during which appellant had ample opportunity to reflect on his actions and the consequences of those actions.  "Only one criterion or factor in aggravation is necessary to support a consecutive sentence. [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 552.)  The court's finding is amply supported by the record.

Appellant argues that it is "unclear from the record if the trial court understood the applicable rules and analyzed the proper factors.  It is also unclear whether the trial court

20

considered any of the mitigating factors in determining whether to impose the consecutive term since none were mentioned by the court . . . ."

We presume the trial court was aware of and followed the applicable law in imposing sentence.  (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)  In order to overcome this presumption, a defendant must affirmatively demonstrate error.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  Appellant has not met this burden.

There is no reason to suspect the trial court was unaware of its authority, or its discretion to determine whether sentences are to run concurrently or consecutively.  We reiterate, in the absence of a clear showing of abuse, we may not disturb the court's exercise of its discretion.  The court abuses its discretion when, after considering all the circumstances, its sentencing decision exceeds the bounds of reason.  (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)  We presume the court considered the relevant criteria in the California Rules of Court in deciding whether to impose consecutive or concurrent sentences. (Cal. Rules of Court, rule 4.425.)  Certainly, the court referenced one of the factors in rule 4.425—that the crimes involved separate acts of violence or threats of violence—when the court imposed a consecutive term for count two.  (Cal. Rules of Court, rule 4.425(a)(2).)

Furthermore, the existence of mitigating factors, which might have supported concurrent rather than consecutive sentences, is not enough to establish an abuse of discretion.  Courts have always been free to weigh aggravating and mitigating factors in terms of both quality and quantity.  (*People v. Roe* (1983) 148 Cal.App.3d 112, 119.)  It is not required to assign the same weight to mitigating factors argued by a defendant and may minimize or even dismiss mitigating factors without stating its reasons.  (*People v. Salazar* (1983) 144 Cal.App.3d 799, 813; *People v. Jones* (1985) 164 Cal.App.3d 1173, 1181.)  In short, trial courts need not state reasons for rejecting or minimizing a mitigating factor, particularly where, as here, no objection was raised when the court

21

imposed a consecutive sentence.  (*People v. Holguin* (1989) 213 Cal.App.3d 1308, 1317; *People v. King* (2010) 183 Cal.App.4th 1281, 1322.)

In sum, we cannot conclude the trial court abused its discretion in imposing consecutive sentences on counts one and two.

*Disposition*

The judgment is affirmed.


_____

ELIA, Acting P. J.


WE CONCUR:


_____

MIHARA, J.


_____

GROVER, J.